Honorable Kathleen Drew, Chair Senate Natural Resources Committee John A. Cherberg Building Room 406 P.O. Box 40482 Olympia, WA 98504-0482
Honorable Steve Fuhrman, Chair House Natural Resources Committee John L. O'Brien Building Room 333 P.O. Box 40600 Olympia, WA 98504-0600
Dear Senator Drew and Representative Fuhrman:
On behalf of the Legislature and pursuant to Senate Concurrent Resolution (SCR) 8435 (copy attached), you have requested our opinion on several questions concerning the authority, rights, and responsibilities of state agencies and institutions with respect to the state's federal grant lands and forest board transfer lands. The questions posed are broad in scope, but primarily have arisen in the context of the Board of Natural Resources' consideration of a habitat conservation plan for such lands, under the federal Endangered Species Act. Before turning to the questions posed and our legal analysis, an understanding of the background of this opinion request is important.
The Legislature's opinion request is unique in certain respects and has prompted this office to vary its historical process and practice in preparing Attorney General opinions. First, this is a request on behalf of the Legislature as an institution, not a request by one or more individual legislators. It not only seeks our legal opinion under current law, but also asks this office to comment on the validity of existing statutes. Except in the most extraordinary circumstances, the Attorney General's Office does not pass on the validity of duly enacted state laws in providing Attorney General opinions. Rather, this office recognizes the presumption of constitutionality afforded legislative enactments and provides legal guidance within the context of those enactments. However, in this instance, in light of the fact that the Legislature, as a body, has requested consideration of the validity of current statutes, this opinion undertakes that consideration where we have determined it appropriate to do so.
Second, within applicable time constraints, SCR 8435 and the Legislature's opinion request seek the most comprehensive and informed consideration of the issues presented. The Senate Concurrent Resolution recognizes that litigation between state agencies and instrumentalities should be a matter of last resort and that the public deserves the best effort of all interested public entities in resolving questions concerning the Department of Natural Resources' proposed habitat conservation plan and other trust land management practices, without incurring the substantial costs and disruptions that litigation would entail. In an effort to accomplish this goal, SCR 8435 provides for this opinion request and for a separate process to facilitate facts relevant to applying the legal principles set forth in this opinion.
The Attorney General's Office fully supports the Legislature's goals. In preparing this opinion, the Attorney General's Office has taken the following measures to assist in achieving them. First, as has been the practice of the Attorney General's Office in the recent past with opinion requests of potentially broad interest, notice of this opinion request was published in the Washington Register, informing interested persons of their opportunity to provide comment. In addition to this process, a copy of the opinion request was provided to the agencies identified in SCR 8435 as having a recognized interest in these questions and also to parties not so identified but who, nevertheless, provided questions for the Legislature's consideration in formulating its opinion request to the Attorney General. The Attorney General's Office invited these agencies and parties to submit written legal analysis of the questions that have been posed and provided an opportunity for these agencies and parties to respond to analysis submitted by others.
Finally, to further ensure the most comprehensive and informed consideration of the questions posed, the Legislature's opinion was prepared by a three person panel comprised of retired State Supreme Court Justice James A. Andersen, serving as a Special Assistant Attorney General for this project; retired Thurston County Superior Court Judge Robert J. Doran, also serving as a Special Assistant Attorney General for this project; and Senior Assistant Attorney General Maureen Hart.
With this background, we now proceed to consider the Legislature's questions. As previously noted, this opinion request poses questions concerning the authority and responsibility of the state with respect to managing two different categories of trust lands — federal grant lands and forest board transfer lands. The Legislature posed its questions regarding the federal grant lands first, followed by questions concerning the forest board transfer lands. We have retained this order in restating the Legislature's questions and except where cross-references facilitate ease of reading and understanding, such as in the summary section of the opinion, we have addressed the questions in the same order.
The questions posed by the Legislature regarding the federal grant lands are:
 FEDERAL GRANT LANDS 1. To what extent is state legislative authority with respect to the federal grant lands constrained by the Enabling Act?
 2. To what extent is state legislative authority with respect to the federal grant lands constrained by common law principles governing the administration of private trusts?
 a. Is the administration of the trust lands subject to laws of general application?
 b. Do the state's duties as trustee run separately to each of the grant land trusts or can the lands be administered as a single trust?
 c. Are the grant land trusts subject to separate accounting of trust income and costs?
 d. May the Legislature empower the Department of Natural Resources and the Commissioner of Public Lands with regulatory authority regarding all forest lands in the state of Washington, including the federal grant lands, as well as the responsibility to manage the federal grant lands?
 3. Is the Department of Natural Resources subject to the trust provisions of RCW Title 11?
 4. Does the Department of Natural Resources have the authority to enter into a long-term agreement regarding management of the federal grant lands as a method of satisfying the Endangered Species Act?
 5. If state statutes leave discretion in the Department of Natural Resources with respect to administration of federal grant lands, against what legal standards is the Department's exercise of discretion in the management of the lands measured?
 a. To what extent may the Department's discretionary grant land management decisions approve of a management plan that encompasses the lands of more than one trust, if the trusts as a whole are benefited by a plan, but individual trusts are benefited unequally or may be disadvantaged by the plan?
 b. To what extent may the Department's discretionary grant land management decisions authorize approval of a management plan that exceeds minimum standards governing use of the lands, if exceeding those standards would result in a reduced short-term economic return but promote a greater long-term economic return?
 c. To what extent may the Department's discretionary grant land management decisions take into account factors other than the economic well-being of a trust, for example, administrative concerns associated with promoting flexibility and stability of all trust land management or environmental considerations?
 6. Does 7 U.S.C. § 303 preclude charging the expenses of managing and administering the federal lands granted for purposes of an agricultural college under Section 16 of the Enabling Act, against proceeds derived from those lands?
The questions posed by the Legislature regarding the forest board transfer lands are:
 FOREST BOARD TRANSFER LANDS 1. To what extent is state legislative authority with respect to forest board lands constrained by common law principles governing the administration of private trusts?
 2. To what extent do common law principles apply to the administration of these lands by virtue of the statutes governing the lands?
 3. If statutes leave discretion in the Department of Natural Resources in administering these lands, against what legal standard is that exercise of discretion to be measured?
 In posing questions concerning the forest board transfer lands, the Legislature has indicated that its questions are prompted by concerns comparable to those raised regarding the federal grant lands and has indicated specific interest in the following two matters:
 a. May the lands be managed as an undifferentiated whole, or must they be managed based on the economic interests of each county separately?
 b. Is the administration of these lands subject to laws of general application?
 SUMMARY
We provide this abbreviated response simply to introduce and provide context for the comprehensive analysis that follows. The comprehensive analysis must be consulted for a full appreciation of the questions posed and a full understanding of this opinion.
Washington's federal grant lands are held in trust pursuant to the Enabling Act and the Washington State Constitution. These documents establish separate trusts for identified purposes. By contrast, Washington's forest board transfer lands are held in trust by virtue of state statute. The statute creates a single trust and provides for its administration, including the distribution of trust revenues.
Common law principles governing the administration of private trusts apply to the state in enacting laws specific to the federal grant lands. As to these trusts, these principles are of constitutional stature in that their source is the Enabling Act and the Washington State Constitution. Thus, they may not be altered by state statute. As to the forest board transfer lands, these common law fiduciary principles are not of constitutional stature. Rather, they are the product of the statute creating the trust of the forest board transfer lands. As such, these common law principles, as well as the trust itself, may be altered or repealed by appropriate legislative enactments.
Although the Legislature's authority is constrained by common law fiduciary principles with respect to enactments specific to the federal grant lands, legislative enactments specific to and governing management of those lands are accorded a deference not granted to management decisions of a private trustee. This deference stems from the presumption of constitutionality that applies to exercises of state legislative authority. So long as the Legislature properly amends governing statutes, its authority is not constrained with respect to the forest board transfer lands.
The federal grant lands and the forest board transfer lands are subject to laws of general application. The Legislature's ordinarily broad authority is not constrained by common law fiduciary principles when it enacts laws of general application.
Common law fiduciary obligations also apply to the Department of Natural Resources (Department) in exercising its discretion in managing the federal grant lands and forest board transfer lands. However, where the Department is directed by statute to manage these lands in a specific way, the Department is bound to comply with statutory directives. The standard against which the Department's discretionary decisions regarding the federal grant land trusts and the forest board lands trust should be measured is an abuse of discretion standard. In the exercise of its discretion, the Department may approve management plans that exceed minimum standards governing use of trust lands, if doing so reflects a reasonable balancing of short-term interests and the protection of trust productivity over the long term. In managing the grant lands, the Department may only take into account factors consistent with ensuring the economic value and productivity of the federal grant lands.
The federal grant land trusts may be administered collectively where such administration furthers the interests of each federal grant land trust. However, income and expenses of each federal grant land trust must be the subject of a separate accounting. The forest board transfer lands may be administered and accounted for as the Legislature properly provides by statute. Under present statutes, the forest board transfer lands need not be managed on the basis of the economic interests of each county individually.
The Department of Natural Resources has the authority to enter into a long-term agreement regarding management of the federal grant lands and forest board transfer lands as a means of complying with the Endangered Species Act, so long as such an agreement does not violate the Department's common law fiduciary duties and is consistent with state statutes directing the manner in which these lands are to be administered. The plan need not benefit the trusts equally. However, to include a trust in the plan, the Department, acting consistently with its fiduciary duties and in the exercise of reasonable judgment, must determine that on balance, the plan is in the economic interests of the trust.
The Legislature properly may grant the Department and the Commissioner of Public Lands regulatory and managerial authority over state trust lands. The Department is not subject to the trust provisions of RCW Title 11. The Morrill Act, 7 U.S.C. § 303, precludes the state from charging the expense of administering lands granted pursuant to Section 16 of the Enabling Act against proceeds derived from the sale of those lands. Proceeds of the sale of such lands include proceeds from the sale of resources that are part of the lands.
 QUESTION 1 TO WHAT EXTENT IS STATE LEGISLATIVE AUTHORITY WITH RESPECT TO THE FEDERAL GRANT LANDS CONSTRAINED BY THE ENABLING ACT? SHORT ANSWER
The terms of Washington's Enabling Act are binding upon the state and cannot be infringed by state legislative acts. Furthermore, the Enabling Act requires that the federal grant lands be held by the state in trust. This places additional constraints upon state authority because it means that the exercise of legislative authority over the federal grant lands will be tested by fiduciary principles.
 BACKGROUND
Before discussing the ramifications of the federal land grants made by Washington's Enabling Act, it is important to understand the context in which the Act came about. A brief overview of that historical context is set forth in National Parks Conservation Association v. Board of State Lands, 869 P.2d 909, 917 (Utah 1993):
 When the thirteen original colonies formed the United States, each held sovereign control over the lands within its borders. Those lands provided a tax base for financing governmental functions, including public education. As the United States expanded westward, additional states were created on lands that belonged to the United States as territories. The federal government retained ownership over much of the land within those states. Because land owned by the federal government was exempt from taxation by the states, those states had a smaller tax base for financing public education. To provide a source of revenue for public education, Congress granted new states federal lands to be used for the support of public schools.
See also Department of State Lands v. Pettibone, 216 Mont. 361,702 P.2d 948, 952 (1985) ("Each of the thirty states carved out of the public domain received such grants, varying in the quantity granted, and terms of the grant, as national policy and political winds dictated.").
 ANALYSIS
On February 22, 1889, Congress passed an enabling act to facilitate the admission of Washington, Montana, and North and South Dakota into the Union. 25 Stat. 676 (1889). The Act required Washington to adopt a constitution containing certain concessions, in exchange for a grant of statehood and a grant of federal lands. One important concession was the establishment and maintenance of a public school system. Enabling Act § 4.
Under the Enabling Act, Washington received approximately three million acres of federal land. See Compensation For HighwayEasements Over School Trust Lands, 42 Wn. L. Rev. 912 n. 5 (1967). Sections 16 and 36 of every township in the state were granted for the support of common schools (K-12), and additional specific amounts of land were granted for a university (University of Washington), for an agricultural college (Washington State University), for a scientific school (Washington State University), for normal schools (also known as teachers' colleges — Central, Eastern, and Western Washington Universities, and The Evergreen State College), for "charitable, educational, penal, and reformatory institutions", and for public buildings at the state capitol.
The 1889 Enabling Act placed conditions on the grants that remain relatively unchanged. The lands granted may not be disposed of except at public sale and for full market value, with the proceeds from such sales placed in a permanent fund for the support and maintenance of each institution. Enabling Act § 11. The Act further states that the lands may be leased and may be exchanged for lands of equal value and as near as may be of equal area. Id.
The Act also allows the sale of timber and other crops from the lands, as well as oil, gas, and other mineral leasing, and identifies the funds available for current support of the schools and other institutions listed. Id. The Enabling Act ends section 11 by stating that "[t]he lands hereby granted . . . shall be reserved for the purposes for which they have been granted". Section 17, which specifies the acreage granted to the institutions of higher education and the "charitable, educational, penal, and reformatory institutions", closes by stating that "the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective States may severally provide".
Following passage of the Enabling Act, the people of Washington drafted and ratified a constitution, and on November 11, 1889, Washington was admitted into the Union. Article 16 of the Washington Constitution sets forth the Enabling Act restrictions on the use and disposition of the federal grant lands and states at the outset that the public lands granted to the state are "held in trust for all the people". Const. art. XVI, § 1.
It is well settled that an acceptance of a grant of federal lands in a state constitution is an acceptance of the terms and conditions set forth in the federal enabling legislation. As an early Washington decision provides:
 [A]n enabling act is, at most, a proposition, and has no binding force upon the people of a territory until they have adopted a constitution and the state has been admitted into the union. Then, if by their constitution they have expressed no dissent from any proposition contained in the enabling act, doubtless they must be held bound by its conditions.
Romine v. State, 7 Wn. 215, 218, 34 P. 924 (1893); see also
State v. City of Seattle, 57 Wn. 602, 613, 107 P. 827 (1910) (state constitution's acceptance of federal grant lands restricted the manner of the sale and disposition of the land and the use of the funds to be derived therefrom). More specifically, a state's acceptance of the enabling act conditions creates both constitutional and contractual obligations. United States v. 78.61 Acres, 265 F. Supp. 564, 567 (D. Neb. 1967). "`[T]he state was and still is under a contractual as well as a constitutional obligation to refrain from disposition or alienation of the use of this property except as allowed by the enabling act and the Constitution.'" Id. at 567 (citing State ex rel. Johnson v. Central Nebraska Pub. Power Irr. Dist., 143 Neb. 153,8 N.W.2d 841, 847-48 (1943)); see also 63A Am. Jur.2d Public Lands § 108, at 605 (1984) (acceptance by a state of a land grant constituted a contract which the state could not violate without violating the Constitution).
The United States Supreme Court has also recognized that the school land grant was a "solemn agreement" analogous to a contract between private parties. Andrus v. Utah, 446 U.S. 500, 507,100 S.Ct. 1803, 64 L.Ed.2d 458, reh'g denied, 448 U.S. 907 (1980). "The United States agreed to cede some of its land to the State in exchange for a commitment by the State to use the revenues derived from the land to educate the citizenry." Id. at 507; see also
Murtaugh v. Chicago, M. St. P. Ry. Co., 102 Minn. 52,112 N.W. 860 (1907) (state solemnly covenanted with United States to apply granted lands to sole use of its schools according to purpose of grant). A legislative grant thus is both compact and law, and once accepted cannot be withdrawn or changed, except with the consent of the state and Congress. See United States v. 111.2 Acres,293 F. Supp. 1042, 1048 (E.D. Wash. 1968), aff'd, 435 F.2d 561 (9th Cir. 1970); 73A C.J.S. Public Lands § 77, at 529 (1983); see also
Gladden Farms, Inc. v. State, 129 Ariz. 516, 633 P.2d 325, 327
(1981).
Thus, each condition of the Washington Enabling Act constrains state legislative authority in respect to the federal grant lands. In addition, the Enabling Act has been held to establish trusts of the granted lands. County of Skamania v. State, 102 Wn.2d 127,132, 685 P.2d 576 (1984). The trust status of these lands imposes additional constraints. While there is a great deal of case law and commentary discussing the trust obligations imposed by the various enabling acts, discussion of the nature of these obligations in Washington must start with the State Supreme Court's analysis in Skamania.
At issue in Skamania was the validity of the Forest Products Industry Recovery Act of 1982. The Legislature passed this legislation after a steep drop in timber prices rendered contracts for the purchase of timber from the federal grant lands and the forest board transfer lands uneconomical. The Recovery Act relieved private companies from performing the contracts and released the state's claims based on the contracts. In its capacity as a beneficiary of the forest board transfer lands, Skamania County sued the state alleging that the Recovery Act was a breach of the state's fiduciary duty to the beneficiaries of those lands and a violation of several constitutional provisions. Skamania, 102 Wn.2d at 131. The State Board of Education and the Board of Regents for the University of Washington intervened as additional parties plaintiff representing certain beneficiaries of the federal grant lands.
The State Supreme Court in Skamania noted initially that the federal grant lands are held in trust for the various purposes identified in the Enabling Act and the Washington Constitution. Id. at 129. The Court then observed that when a statute is passed pursuant to the police power, the only limitation upon the Legislature is that the statute must reasonably tend to correct some evil or promote some interest of the state and not be contrary to any constitutional provision. "Where the statute deals with state trust lands, however, the permissible goals of the legislation are more limited." Id. at 132. The Court then noted that the federal grant land trusts were created to benefit certain beneficiaries and that "[e]very court that has considered the issue has concluded that these are real enforceable trusts". Id. For support, the Court cited the U.S. Supreme Court's interpretation of the Arizona Enabling Act in Lassen v. Arizona ex rel. Arizona Highway Department, 385 U.S. 458, 87 S.Ct. 584,17 L.Ed.2d 515 (1967). While noting that Lassen involved a different enabling act than Washington's, the Court held that the principle of Lassen applies to Washington's Enabling Act and cited as support the following passage from United States v. 111.2 Acres, 293 F. Supp. at 1049:
 There have been intimations that school land trusts are merely honorary, that there is a "sacred obligation imposed on (the state's) public faith," but no legal obligation. These intimations have been dispelled by Lassen v. Arizona . . . This trust is real, not illusory.
See also Board of Natural Resources v. Brown, 992 F.2d 937, 941
(9th Cir. 1993) ("Pursuant to the terms of Washington's Enabling Act, this land is to be held in trust by Washington for the support of various public institutions, including state public schools, colleges, and universities.").
Having concluded that the federal grant lands constitute enforceable trusts, the Court in Skamania concluded further that when the state enacts laws governing trust assets, its actions will be tested by fiduciary principles. Skamania,102 Wn.2d at 133. The Court then held that the state had violated its duty of undivided loyalty to the trust beneficiaries and its duty to act prudently by enacting a law aimed at benefiting the timber industry and the state economy in general at the expense of the trust beneficiaries. Id. at 136-39.
We are well aware that commentators have criticized Skamania for relying on cases that interpreted the New Mexico-Arizona Enabling Act and for failing to analyze the terms of Washington's Enabling Act. See e.g., Sally K. Fairfax et al., The School Trust Lands: AFresh Look at Conventional Wisdom, 22 Envtl. L. 797, 847 (1992) (by citing the decision in 111.2 Acres that relied on Lassen, Skamania "invisibly incorporated Arizona's statehood bargain into Washington's"); see also Tacy Bowlin, Comment, Rethinking the ABCsof Utah's School Trust Lands, 1994 Utah L. Rev. 923, 926 (significance of the variation in the legal documents establishing the school land grants has been overlooked in the state and federal jurisprudence interpreting the obligations of the western states, as trustees, in managing and disposing of school land grants). The New Mexico-Arizona Enabling Act expressly declares that the federal grant lands shall be held in trust, while Washington's Enabling Act makes no reference to the word "trust", but states simply that certain amounts of land are granted for the support of certain institutions. Lassen, 385 U.S. at 523; Enabling Act §§ 10, 17.
The unanimous decision of our Supreme Court in Skamania, however, represents the law of this state. Despite the criticism of commentators, we have found ample support for the Skamania conclusion that a trust relationship may be created without the use of the word "trust". In spite of the absence of an express trust declaration in the 1889 Enabling Act, the supreme courts of Montana and South Dakota have concluded that the grant of federal lands made to their states constitutes a trust to which fiduciary principles apply. Pettibone, 702 P.2d at 953; Kanaly v. State,368 N.W.2d 819, 821-24 (S.D. 1985). Both the North and South Dakota constitutions provide that the lands and proceeds granted for the support of state educational institutions shall be deemed a perpetual trust fund. Kanaly, 368 N.W.2d at 824; State v. Murphy,54 N.D. 529, 210 N.W. 53, 55 (1926). (As noted earlier, the Dakotas, Montana, and Washington were invited into the Union pursuant to the same enabling legislation.)
A federal district court concluded that Nebraska's enabling legislation created a trust despite the lack of a express reference thereto in United States v. 78.61 Acres,265 F. Supp. at 567. The court observed initially that Nebraska's enabling act simply states that the lands are granted to Nebraska "for the support of common schools", and that it does not contain the express restrictions that were incorporated in later acts. Id. The court concluded that, nevertheless, the enabling act contained binding implied restrictions, one of which was that the grant was made in trust for a specific purpose. Id.
Other courts have effectively concluded that state constitutional provisions providing that public lands are held in trust are stating expressly what the enabling legislation implies. See
National Parks, 869 P.2d at 917 (Utah accepted school lands and agreed to hold them in trust for the purposes for which they were given); see also Pettibone, 702 P.2d at 951 (the 1889 Montana Constitution accepted school lands and provided that they would be held in trust consonant with the terms of the Enabling Act); Kanaly, 368 N.W.2d at 821 (the South Dakota Constitution, adopted in 1889, mirrored the permanent trust fund requirement of the Enabling Act).
Thus, pursuant to Skamania and the other authority set forth above, we conclude that the Enabling Act requires the federal grant lands to be held in trust in addition to placing binding restrictions on the use and disposition of those lands. We address the impact of the trust requirement and the Skamania conclusion that fiduciary principles apply to state actions regarding the federal grant lands in our discussion of the following question.
 QUESTION 2 TO WHAT EXTENT IS STATE LEGISLATIVE AUTHORITY WITH RESPECT TO THE FEDERAL GRANT LANDS CONSTRAINED BY COMMON LAW PRINCIPLES GOVERNING THE ADMINISTRATIVE OF PRIVATE TRUSTS? SHORT ANSWER
Common law principles governing the administration of private trusts constrain legislative authority with respect to enactments specific to the federal grant lands. However, the Legislature's management decisions are accorded a deference not granted a private trustee because of the presumption of constitutionality that applies to exercises of state legislative authority. Although the state must comply with common law duties in administering the federal grant lands, a number of these duties ordinarily are flexible and are flexible in the context of federal grant land administration. A trustee's duty with respect to diversification is one such duty and should include periodic evaluation of whether the assets of the grant land trusts are appropriately diversified.
 ANALYSIS
In discussing a question dealing with state legislative authority, it is important to note at the outset that the state constitution is not a grant, but a restriction on the legislative power, and the power of the Legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions. State ex rel. Distilled Spirits Inst., Inc. v. Kinnear, 80 Wn.2d 175, 180,492 P.2d 1012 (1972); Overlake Homes, Inc. v. Seattle-First Nat'l Bank, 57 Wn.2d 881, 884, 360 P.2d 570 (1961). Where the validity of a statute is assailed, there is a presumption of its constitutionality. Overlake Homes, 57 Wn.2d at 884; see also World Wide Video, Inc. v. Tukwila, 117 Wn.2d 382, 392, 816 P.2d 18
(1991), cert. denied, 503 U.S. 986 (1992). This presumption is emphasized where the Legislature exercises its police power:
 A broad discretion is . . . vested in the legislature to determine what the public interest demands under particular circumstances, and what measures are necessary to secure and protect the same. Unless the measures adopted by the legislature in given circumstances are palpably unreasonable and arbitrary so as to needlessly invade property or personal rights as protected by the constitution, the legislative judgment will prevail.
Reesman v. State, 74 Wn.2d 646, 650, 445 P.2d 1004 (1968); Shea v. Olson, 185 Wn. 143, 153, 53 P.2d 615, 111 A.L.R. 998 (1936). With this broad scope of authority and the related deference in mind, we now consider the extent to which trust principles constrain the Legislature's authority with regard to the federal grant lands.
We have already seen that the acceptance of the Enabling Act conditions in the Washington Constitution requires the application of common law trust principles to the administration of the federal grant lands. See Skamania, 102 Wn.2d at 129; see also State ex rel. Hellar v. Young, 21 Wn. 391, 392, 58 P. 220 (1899) (permanent school fund of this state must be regarded as a trust fund because it was made such by the state constitution). Given this conclusion, it has been held to follow that the common law duties of a trustee must be assumed by the state in managing the grant lands. National Parks, 869 P.2d at 918; 63A Am. Jur.2d Public Lands § 112, at 612 (1984). The Washington Supreme Court stated in Skamania that the federal grant land trusts "impose upon the State the same fiduciary duties applicable to private trustees". Skamania, 102 Wn.2d at 132. The Court also observed, however, that the application of trust principles to state legislation regarding the federal grant lands does not alter the principle that all reasonable presumptions and inferences will be made in favor of the legislation's constitutionality:
 We merely hold that when the State enacts laws governing trust assets, its actions will be tested by fiduciary principles. What this means in practice is that the range of permissible goals is narrower than when the Legislature exercises its police powers; it does not alter the challenger's burden to prove the statute's invalidity beyond a reasonable doubt.
Id. at 133.
The way in which the Skamania Court framed the questions for its review reflects the deference accorded to the Legislature even when it is acting in its capacity as trustee. The Court stated that it needed to resolve (1) whether the plaintiffs had proved beyond a reasonable doubt that the Legislature acted with divided loyalty, and (2) if the Legislature acted solely to benefit the trusts, whether any set of facts existed to justify the Legislature's conclusion that the Forest Products Industry Recovery Act was in the trusts' best interests. Id. at 134. Thus, while holding that the Legislature assumes the duties of a trustee when acting on behalf of the federal grant land trusts, the Court in Skamania also held that its performance of these duties is regarded with more deference than would be the performance of such duties by a private party.
The Restatement (Second) of Trusts (1959) and Restatement (Third)of Trusts (1990) identify and discuss the following relational duties of a trustee: a duty to administer the trust, a duty of undivided loyalty, a duty to delegate trustee duties only when reasonable, a duty to keep and render accounts, a duty to furnish information to beneficiaries, a duty to exercise reasonable care and skill in managing the trust, a duty to take and keep control of trust property, a duty to preserve trust property, a duty to enforce claims held by the trust, a duty to defend actions that may result in loss to the trust, a duty to keep trust property separate from other property, a duty to use reasonable care regarding bank deposits, a duty to make the trust property productive, a duty to pay income to the beneficiaries, a duty to deal impartially with beneficiaries, a duty to use reasonable care to prevent breach of the trust by co-trustees, and a duty to follow the direction of persons given control over the trustee. Restatement (Second) of Trusts §§ 169-185; Restatement (Third) of Trusts §§ 170-171, 181, 183-185.
Chief among the duties discussed in the grant land cases is that of undivided loyalty to the trust beneficiaries. See Skamania,102 Wn.2d at 137 (the state as trustee may not use trust assets to pursue other state goals); see also State ex rel. Ebke v. Board of Educ. Lands Funds, 154 Neb. 244, 47 N.W.2d 520, 525-26 (1951) (state may not enact legislation for the benefit of lessees of public school lands at the expense of the beneficiaries of the trust); State v. University of Alaska, 624 P.2d 807, 813-14
(Alaska 1981) (state breached duty to administer trust solely in interest of beneficiaries by failing to compensate trust for value of university land included in state park). The duty to preserve the principal of the trust is also mentioned. See Kanaly,368 N.W.2d at 824 (state, as trustee, has duty to preserve the trust fund's principal and thus it cannot give away trust property); see also 78.61 Acres, 265 F. Supp. at 567 (fact that United States is grantee of right-of-way over school lands does not alter principle that the res of the trust may not be depleted; trust must receive compensation for grant). The duty of a trustee to manage trust assets prudently often is mentioned along with the two duties already discussed. In Skamania, for example, the Court stated that the state violated the duty to manage trust assets prudently by releasing, through the Forest Products Industry Recovery Act, valuable contract rights held by the Department of Natural Resources on the trusts' behalf. The Court concluded that "no prudent trustee could conclude that the unilateral termination of these contracts was in the best interests of the trusts". Skamania, 102 Wn.2d at 139. Similarly, the Nebraska Supreme Court invalidated legislation that allowed lessees of public school lands to renew their leases without competitive bidding and at a rental figure based on an appraised valuation rather than fair market value on the ground that such an arrangement violated all standards of prudent management. State ex rel Ebke,47 N.W.2d at 524-26.
Some of the duties of a private trustee are more flexible in application, and this flexibility may be highlighted in the context of federal grant land administration. One such duty is that of making the trust productive, of maximizing its economic returns. While the duty of maximizing economic returns always conflicts to some extent with the duty of preserving the trust property, this conflict may be exacerbated in the case of the federal grant lands because of their perpetual nature. The Oklahoma Supreme Court alluded to this conflict in Oklahoma Education Ass'n, Inc. v. Nigh, 642 P.2d 230 (Okla. 1982). In Nigh, the Court invalidated legislation providing for low-interest mortgage loans of trust funds and low-rental leases of trust lands to farmers and ranchers on the grounds that the statutes violated the duty of the state as trustee to maximize the return to the trust estate. Nigh, 642 P.2d at 236. The Court also noted, however, that the duty to maximize return to the trust estate from the trust properties is subject to the taking of necessary precautions for the preservation of the trust estate. Id. at 239.
The Montana Supreme Court went one step further in State ex rel. Thompson v. Babcock, 147 Mont. 46, 409 P.2d 808 (1966), and concluded that maximization of immediate income was, in effect, trumped by the need to preserve the trust properties. The court there upheld the rejection of an unrealistically high bid to farm trust property, the rejection being based on the fear that the lessee would not fulfill the lease term and would cut corners on good husbandry practice. The court observed that as the trustees of state lands, the State Board of Land Commissioners owes a higher duty to the public than does an ordinary businessman.
 Therefore, they may not speculate as to the possibility of receiving a higher return for leased land, but must secure a "sustained income" which will continually benefit the public in general. . . . it is the Board's duty to get the best lessees possible, so the state may receive the maximum return with the least injury occurring to the land.
State ex rel. Thompson, 409 P.2d at 812 (citation omitted). Washington statutes adopting a sustained yield policy for the state-owned forested lands reflect consideration of the common law duty of making the trust productive over time. See RCW 79.68.030 (sustained yield plans mean management of the forest to provide harvesting on a continuing basis without major prolonged curtailment or cessation of harvest); see also State ex rel. Forks Shingle Co. v. Martin, 196 Wn. 494, 83 P.2d 755 (1938) (upholding statutes establishing sustained yield plan with respect to lands granted to the state for common schools). As one commentator states, "income maximization cannot be the trustee's overarching objective without, in some instances, requiring the State to breach its duty to the future beneficiaries of the trust". Bowlin, 1994 Utah L. Rev. at 956.
Another commentator adds that this tension between current and future beneficiaries is not unique to the school trust lands: "[T]he apparently competing obligations imposed on state land managers differ little from the competing obligations traditionally visited on private trustees who must be concerned both with income for current beneficiaries and preservation of assets for future beneficiaries." Wayne McCormack, Land Use Planning and Management of State School Lands, 1982 Utah L. Rev. 525, 541. Indeed, the Restatement expressly recognizes that this conflict may give rise to a more flexible duty of impartiality with regard to multiple beneficiaries.
 [T]he divergent economic interests of trust beneficiaries give rise to conflicts of types that cannot simply be prohibited or avoided in the investment decisions of typical trusts. These problems regularly present the trustee with problems of conflicting obligations. The interests of a life beneficiary, for example, are almost inherently in competition with those of the remainder beneficiaries[.]
. . . .
 These conflicting fiduciary obligations result in a necessarily flexible and somewhat indefinite duty of impartiality. The duty requires the trustee to balance the competing interests of differently situated beneficiaries in a fair and reasonable manner.
Restatement (Third) of Trusts § 227 cmt. c, at 13 (1990). Thus, the state's administration of the school trust lands highlights some of the already recognized tensions inherent in satisfying the duties of productivity and preservation, as well as that of impartiality.
A common law duty that also presents important considerations with respect to the grant land trusts is that of diversification. The Restatement (Third) of Trusts, section 227, has incorporated a formerly separate provision regarding a trustee's duty to diversify into the prudent investor rule. The rule provides that in making and implementing investment decisions, the trustee has a duty to diversify the trust's investments unless, under the circumstances, it is prudent not to do so. Restatement (Third) ofTrusts § 227(b). In a similar vein, the Washington Court of Appeals has stated that a trustee has a general obligation to diversify, unless the settlor expressly relieves the trustee of that duty or unless circumstances dictate that it is not prudent to diversify. Baker Boyer Nat'l Bank v. Garver, 43 Wn. App. 673,679-80, 719 P.2d 583, review denied, 106 Wn.2d 1017 (1986).
Reasonable diversification is designed to distribute the risk of loss in order to preserve the corpus of the trust. Baker Boyer Bank, 43 Wn. App. at 679 (citing Restatement (Second) of Trusts § 228 cmt. a); 76 Am. Jur.2d Trusts § 542 (1992). Asset allocation decisions deal with the categories of investments to be included in a trust portfolio and the portions of the trust estate to be allocated to each. These decisions are subject to adjustment from time to time as changes occur in economic conditions or expectations or in the needs or investment objectives of the trust. Restatement (Third) of Trusts § 227 cmt. g.
Comments following the Restatement's prudent investor rule provide additional guidance with regard to the duty to diversify. TheRestatement explains that in investing the funds of a trust, the trustee's normal strategy must be to make preservation of the trust estate a significant consideration. Moreover, "the general emphasis in the typical trustee's asset management program is on long-term investment". Restatement (Third) of Trusts § 227 cmt. e, at 20. The Restatement adds that "diversification concerns do not necessarily preclude an asset allocation plan that emphasizes a single category of investments as long as the requirements of both caution and impartiality are accommodated in a manner suitable to the objectives of the particular trust". Restatement (Third) ofTrusts § 227 cmt. g, at 26. Nevertheless, trustees ordinarily have a duty to diversify investments, and departures from a diversified portfolio must be justified. Restatement (Third) of Trusts § 77 cmt. e, f.
In considering the diversification required with respect to the grant land trusts, it may be of value to note that the decision to allow the grant lands to even be considered as marketable prompted vigorous debate at the 1889 constitutional convention, with some delegates concerned about sacrificing the interests of future generations for current gain. The Day at Olympia, Morning Oregonian, August 18, 1889 at 1; The School Lands, Tacoma Daily News, August 17, 1889, at 1. Some of the proposed versions of article 16, section 1 of the Washington Constitution would have held the grant lands "reserved forever". See Journal of theWashington State Constitutional Convention, at 794-95 (1962). While article 16, section 3 of the Washington Constitution was written to allow the sale of the grant lands in phases (no more than 1/4 of the lands could be sold before 1895 and no more than 1/2 before 1905), there is no provision in the state constitution requiring the state to dispose of its granted lands. As an early case noted:
 The state is free to retain title to its timber lands granted for support of the schools and market the timber crop growing on them as it matures. The constitution recognizes the possible sale of timber and other material on granted lands as a source of revenue apart from the sale of the land itself.
State ex. rel Forks Shingle Co., 196 Wn. at 501.
Moreover, although the primary purpose of the school land trust is to maximize the economic productivity of school trust lands, that does not mean that school lands must be administered to maximize economic return in the short run.
 The beneficiaries of the school land trust, the common schools, are a continuing class, and the trustee must maximize the income from school lands in the long run. Certainly it would be as much a violation of the state's fiduciary obligations to immediately sell all state school lands as it would be to use the proceeds from the lands for a nontrust purpose.
National Parks, 869 P.2d at 921 (citation omitted); see also Bowlin, at 953 (where the state contemplates disposing of a school land tract, it should balance the prospect of receiving certain immediate income against the prospect of furthering the purpose of the trust as a whole).
Some of the grant land beneficiaries have expressed concern with whether the assets of the grant land trusts are appropriately diversified. In this respect, they note that a significant percentage of the trusts are in timber land holdings that they believe are currently underproductive.
It is beyond the scope of an Attorney General's Opinion to determine whether the federal grant land trusts are appropriately diversified. However, some general information concerning the composition of the trusts and laws designed to further appropriate diversification is worthy of note.
The state has retained a significant percentage of the lands that it was granted at statehood. As of 1992, Washington held 47 percent of the lands that it received by virtue of the Enabling Act. Jon A. Souder Sally K. Fairfax, State Trust Lands: History,Management, Sustainable Use at 48-49 (1996). Although these lands are put to a variety of uses, a 1990 analysis indicates that Washington used 70 percent of its trust land for timber production. Jon A. Souder et al., Sustainable Resource Managementand State School Lands: The Quest for Guiding Principles, 34 Nat. Resources J. 271, 281 (1994). Thus, timber provides a significant, albeit far from exclusive, source of trust revenues. Other sources of revenue from the federal grant lands include agricultural leases, mineral leases, rights-of-way leases, special forest products, and commercial real estate. Department of NaturalResources Annual Report, at 17-25 (1995). In addition to land assets that comprise a portion of the trusts, the permanent funds also form a substantial part of the corpus of these trusts. As of June 1995, the total market value of the permanent trust funds was in excess of one-half billion dollars. Deloitte Touche, Economic Analysis Prepared for Washington State Department of Natural Resources, June 1996, pp. 2-55, 2-56.
Additionally, current state statutes view appropriate diversification as an important consideration in administering the federal grant land trusts. Under RCW 79.01.095, the Legislature has directed a periodic economic analysis of state lands held in trust, where the maximization of economic return to the beneficiaries is the prime objective. This economic analysis focuses on the relative merit of trust holdings and is to be considered by the Department in determining whether to sell or lease the lands or resources from the lands. The economic analysis is to include:
 (1) Present and potential sale value; (2) present and probable future returns on the investment of permanent state funds; (3) probable future inflationary or deflationary trends; (4) present and probable future income from leases or the sale of land products; and (5) present and probable future tax income derivable therefrom[.]
RCW 79.01.095. State law also requires diversification in investment of the permanent funds. RCW 43.84.150, 43.33A.140.
Nothing in this opinion is intended to suggest that the federal grant land trusts currently are not properly diversified. In summary, however, a trustee has an obligation to diversify trust assets unless under the circumstances it is prudent not to do so. In the exercise of reasonable prudence, a trustee should periodically evaluate the trust portfolio to ensure that it appropriately reflects the interests of the trust.
This opinion now addresses several more specific questions concerning the application of common law trust principles to the state's administration of the federal grant lands.
 a. IS THE ADMINISTRATION OF THE TRUST LANDS SUBJECT TO LAWS OF GENERAL APPLICATION? SHORT ANSWER
Federal and state laws of general application apply to the federal grant lands.
 ANALYSIS
In materials submitted for our consideration, the Washington State School Directors' Association explains that the federal grant lands are subject to laws of general application just as private lands would be. The Department agrees. The universities, on the other hand, appear to suggest that such laws apply only if they serve the interests of the trusts.
Whether a federal law of general application applied to Washington's grant lands was considered in Case v. Bowles,327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946). Case dealt with this state's refusal to hold the federal Emergency Price Control Act applicable to the sale of school-land timber. The state contended that such sales were not subject to price control because of the state constitutional requirement that the school lands "shall not be sold except at public auction to the highest bidder", but the Court disagreed. The Court observed initially that the price control act applied generally to sales of commodities by the states. Case, 327 U.S. 98-99. While acknowledging the safeguards set forth in the Enabling Act and the Washington
Constitution with regard to the disposition of school lands, the Court found that none of this history indicated a purpose on the part of Congress "to enter into a permanent agreement with the States under which States would be free to use the lands in a manner which would conflict with valid legislation enacted by Congress in the national interest". Id. at 100. Where Congress has enacted legislation authorized by its granted powers, and where the state has a conflicting law which but for the congressional act would be valid, the supremacy clause of the federal constitution governs. Id. at 102.
The Case decision was cited when the state again sought to protect its grant land policies in the face of conflicting federal legislation in Board of Natural Resources v. Brown, 992 F.2d 937
(9th Cir. 1993). At issue in Brown was the constitutionality of the Forest Resources Conservation and Shortage Relief Act, which restricted the export of unprocessed timber harvested from federal and state public lands in the western United States. The Act affected the trust lands in Washington by reducing significantly the income generated from the sale of timber harvested from the land. Brown, 992 F.2d at 941.
The Ninth Circuit rejected the state's argument that the United States has a continuing obligation to act in the best interest of the federal grant land trusts that includes ensuring that the timber harvested from trust lands will be sold at full-market value. Id. at 944. The court found that Case was controlling precedent that made the state's position untenable.
 Case stands for the proposition that "valid legislation enacted by Congress" trumps the Boards' ability to use the trust lands in whatever way they wish. The Act . . . passes the rational basis test of constitutional validity. The incidental and detrimental affect the Act has on the trust lands does not, under Case, render the Act invalid.
Id. at 944-45.
An additional federal law of general applicability that must be mentioned here is the Endangered Species Act of 1973 (16 U.S.C. §§ 1531 et seq). While this Act is discussed in greater detail in Question 4, we note here that the Act prohibits anyone from harming or injuring any endangered or threatened animal on all land in the United States. Babbitt v. Sweet Home Chapter, 515 U.S. ___, 115 S.Ct. 2407, 132 L.Ed.2d 597, 611 (1995).
Accordingly, the administration of the federal grant lands is subject to federal laws of general application. The same is true of state laws of general application. In National Parks, the Utah Supreme Court observed that trustees clearly have a duty to act according to applicable law. National Parks, 869 P.2d at 921, n. 9; see also Archer v. Board of State Lands Forestry, 907 P.2d 1142,1147 (Utah 1995) (the Court cited with apparent approval the statement that in exercising trust duties, the state must maximize revenue in a manner that best serves the beneficiaries within the provisions of applicable law). Thus, if the Legislature enacted statewide zoning laws that affected the value of school lands, that would not be a violation of the trust. "[G]eneral laws enacted pursuant to the police power are not likely to violate the terms of the trust." National Parks, 869 P.2d at 921 n. 9. The Colorado Supreme Court expressly held that there was no such violation in Colorado State Bd. of Land Comm'rs v. Colorado Mined Land Reclamation Board, 809 P.2d 974 (Colo. 1991). The court there found county zoning laws applicable to school trust lands. Id. at 982.
In Washington as well, administration of the trust lands must adhere to state laws of general application. As stated earlier, the Skamania court noted that the general police powers of the state are not constrained by its trust land obligations. "Where the statute is passed pursuant to the police power, the only limitation upon the Legislature is that the statute must reasonably tend to correct some evil or promote some interest of the State, and not be contrary to any constitutional provision." Skamania, 102 Wn.2d at 132. Thus, the Skamania Court also drew a distinction between statutes passed pursuant to the police power and those that deal with state trust lands, and analyzed the former as laws of general application. See Skamania,102 Wn.2d at 132.
The applicability of the police power to Washington's federal grant lands was demonstrated when the State Supreme Court found the requirements of SEPA applicable to a Department of Natural Resources decision to sell timber on land held in trust for educational purposes in Noel v. Cole, 98 Wn.2d 375, 380,655 P.2d 245 (1982). Although no party challenged the applicability of SEPA to the trust lands, the Court noted that the Department was required to prepare an environmental impact statement before any timber sale constituting a major action significantly affecting the environment. Noel, 98 Wn.2d at 380. An earlier decision by the Court applied the Forest Practices Act legislation to all forest lands in the state, including the trust lands. West Norman Timber, Inc. v. State, 37 Wn.2d 467, 224 P.2d 635 (1950). Again, although no party directly raised the issue of the Act's applicability to the trust lands, the court ruled that the Act restricted the amount of acreage on school trust lands from which the plaintiff could cut timber. The Court observed first that the Act was for the general or public welfare and was a proper exercise of the police power. West Norman Timber, 37 Wn.2d at 475. The Court then decided that any diminution of the state's authority over its timber lands that resulted from the Forest Practices Act was permissible:
 In so far as the authority of the state over its timber lands is concerned, any diminution of that authority by the statutes above referred to is clearly for the public benefit and for the protection of the very valuable timber properties now owned or in the future to be owned by the state.
Id. at 477.
In West Norman Timber, the Forest Practices Act in effect trumped the duty of the trustee to maximize the economic return from the trust lands. This type of legislation stands in contrast to the act invalidated in Skamania, which focused on the state's trust lands. Skamania, 102 Wn.2d at 136. Although the legislation in Skamania was afforded a presumption of constitutionality, it did not have general applicability and did not carry with it the deference accorded an exercise of the police power.
 State law cannot single out the trust lands. The trusts cannot be obligated to donate resources to highway construction or parks programs. Nor can the state regulate (or abrogate) state trust contracts in a unique way. However, state laws of general applicability, such as a water quality regulation or historic preservation statute, can be applied to trust lands even if significant losses are imposed on the trust.
Jon A. Souder Sally K. Fairfax, State Trust Lands: History, Management, Sustainable Use 163 (1996).
It is apparent, therefore, that administration of the trust lands is subject to both state and federal laws of general application.
b. Do The State's Duties As Trustee Run Separately To Each Of TheGrant Land Trusts Or Can These Lands Be Administered As A SingleTrust?
 SHORT ANSWER
The state's duties as trustee run separately to each of the federal grant land trusts. However, where joint administration serves the interests of each trust, such administration is permissible.
 ANALYSIS
Under the common law pertaining to private trusts, there is no absolute bar to administering multiple trusts as one. A New York court observed that even where separate and distinct trusts are created by will, trustees have been permitted to maintain the assets in solido for convenience in investment and administration. In re Froehlich's Estate, 121 N.Y.S.2d 917, 922 (1950). A leading treatise acknowledges that "under proper circumstances the court may permit two trusts to be administered as one". IIA William F. Fratcher, Scott on Trusts § 179.2, at 503 (4th ed. 1987). Another authority notes that it has been held proper for a trustee to administer and maintain as a whole the assets of separate and distinct trusts, where it is done for purposes of convenience in investment and administration and more efficient and economical management, and no loss results therefrom. 90 C.J.S. Trusts § 270, at 350 (1955).
Much of state legislation concerning the administration of federal grant lands affects them collectively. RCW 79.01.094 authorizes the Department to exercise general supervision and control over the sale or lease of educational lands in general. Similarly, RCW 43.30.150(2) addresses the Department's responsibility to manage "all lands and resources" to achieve the maximum effective development. Although there are statutory references to the specific trusts (see, for example, the plan for charitable, educational, penal, and reformatory institution property in RCW 79.01.006), it would appear that the overall legislative scheme is one of collective administration of the federal grant lands.
It is clear that the types of lands granted are not unique to each trust. Economies to each trust may be realized by administering similarly situated lands in a similar manner. If this is so, or if collective management otherwise furthers the interests of each trust, the law would allow the state to administer the federal grant lands collectively. Where such joint administration does not conflict with the separate allocation of costs and expenses to each trust, a subject discussed below, such administration is permissible.
c. Are The Grant Land Trusts Subject To A Separate Accounting OfTrust Income And Costs?
 SHORT ANSWER
Separate trust funds must be maintained for each federal grant land trust and the trusts must be accounted for separately.
 ANALYSIS
A trustee is under a duty to the beneficiaries of the trust to keep clear and accurate accounts. IIA Fratcher, § 172 at 452. Stated more fully, the trustee must hold trust property separate from other property owned or managed by the trustee, and must also deal with the beneficiary with fairness, openness, and honesty. Jon A. Souder et al., Sustainable Resources Management and State School Lands: The Quest for Guiding Principles, 34 Nat. Resources J. 271, 279 (1994). Under most circumstances, this means that a trustee of distinct trust funds must segregate the different funds and has no authority to permit a diversion of the funds or income from one trust to another. 90 C.J.S. Trusts § 270, at 350. To ensure that such standards are being met, the trustee is specifically and comprehensively accountable to the beneficiary. At common law, a trustee must keep proper records and must furnish this information to the beneficiary on demand. Souder, at 279; see also State v. Taylor, 58 Wn.2d 252, 258, 362 P.2d 247,86 A.L.R.2d 1365 (1961).
As stated earlier, Washington's Enabling Act refers to the establishment of "permanent funds" for the support and maintenance of the public schools and the other institutions for which the lands were granted. The Act does not refer to a single permanent fund out of which the various institutions will receive financial support, though it does allow for the pooling of monies received from mineral leasing so long as the monies are apportioned in proportion to the number of acres originally granted each institution and the public schools. Enabling Act § 11. An early Washington decision supports the conclusion that the Enabling Act created separate funds to benefit separate trusts. School Dist. v. Bryan, 51 Wn. 498, 505, 99 P. 28 (1909) ("the common school fund is just what it purports to be, a fund to be used for the sole purpose of supporting the graded schools of the commonwealth"). Article 16, section 5 of the Washington Constitution makes specific reference to the "permanent common school fund". Thus, the state constitution and the Enabling Act reflect the separate character of the federal grant land trusts.
It would appear that the state legislature has interpreted these provisions in large part to mean that the funds pertaining to each institution are to be maintained separately. RCW 43.79 establishes a permanent fund for each institution listed in the Enabling Act with the exception of the permanent common school fund, which is established by RCW 28A.515.300. RCW 79.08 makes several references to income from the public lands being allocated to the particular fund for which the lands are held in trust. See, e.g., RCW 79.08.104, .106. In addition, RCW 43.84.051 provides that interest and other income received by the state treasurer shall be paid "into the respective funds to which the principal and interest shall accrue", and RCW 43.84.130 provides that the state treasurer shall keep a separate accounting of the amount of cash balances in the state treasury belonging to the permanent school fund. Under state law, such an accounting is a public record and accessible by the public. RCW 42.17.290; RCW 40.14.010.
In light of these legal principles and the Legislature's request that as appropriate, this opinion comment on the validity of current statutes, we note that an exception to this policy of keeping the separate trust funds separate is found in RCW 79.64, the Resource Management Cost Account (RMCA). RCW 79.64 allows up to 25 percent of certain grant land revenues to be retained for the purpose of paying the costs of trust land management activities and investments. More specifically, RCW 79.64.030
authorizes a pooling of these grant land proceeds to pay the costs and expenses incurred by the Department in managing and administering the various grant lands. As originally enacted, this statute did not allow a pooling of funds but required the funds collected to be used to defray the expenses incurred in managing the public lands of the same trust from which they were derived. Laws of 1961, ch. 178, § 3. As later amended, this statute authorized revenues derived from one trust to be used to pay expenses of another. However, the statute further provided for an annual accounting of the expenditures accrued by each trust. If the accounting determined that expenditures were made from moneys derived from one category of trust lands for the benefit of another, such expenditures were considered a debt against the trust benefited. Laws of 1977, Ex. Sess., ch. 159, § 2.
The statute was amended in 1993 to allow for the pooling of the funds gathered and their subsequent use by the Department to defray costs incurred in managing "all of the trust lands". Laws of 1993, ch. 460, § 2. An annual accounting now is made of the accrued expenditures from the pooled trust funds in the account. If the accounting determines that expenditures have been made from trust land moneys for the benefit of lands not part of the grant land trusts, such expenditures constitute a debt against the property benefited. RCW 79.64.030. However, no such reconciliation is provided where revenues from one grant land trust are used to pay the expenses of another. A legislative report explains that this amendment gave the Department additional flexibility in managing and expending trust management revenues, in that it is no longer required to account for and expend revenue in the RMCA by each separate trust category. 1993 Final Legislative Report, at 165.
RCW 79.64.040 provides that 25 percent of a sum received by the Department in connection with any one transaction pertaining to public lands may be deposited in the RMCA. WAC 332-100-040 further provides that the deductions may be temporarily discontinued when the RMCA balance exceeds an amount equal to 12 months' operating expenses. Such a discontinuation may remain effective until the RMCA balance is reduced to an amount equal to 3 months' operating expenses. Some of the beneficiaries point out that under this system, the trusts that generate income early in the year will pay the expenses of those that generate funds later in the year or not at all.
In materials submitted for our consideration in preparing this opinion, the Department suggests that the process of creating debts between the trusts and repaying them with interest was not reflective of the fact that most of the costs of managing trust lands come from shared systems and management activities. We acknowledge that it is common practice for the ordinary expenses of administering a trust to be deducted from trust income. George T. Bogert, Trusts § 124, at 446 (6th ed. 1987); Moon v. State Bd. of Land Comm'rs, 111 Idaho 389, 724 P.2d 125, 129 (Idaho 1986). However, as stated above, the expenses of one trust normally may not be deducted from the income of another. Though it may be that each trust ultimately will bear its appropriate share of administrative expenses, no statutory provision so requires. We find no basis for concluding that the 25 percent deduction relates to the costs and expenses incurred by each trust.
Washington's Enabling Act and constitution created separate trusts to benefit separate beneficiaries who are entitled to separate accounting of the costs and expenses being charged to each trust. While acknowledging the presumption of constitutionality granted the RMCA statutes, we would conclude that unlike earlier versions of the RMCA that provided for a separate accounting of trust revenues and expenses and repayment of any loans between trusts with interest, the 1993 version of the RMCA is most likely constitutionally defective.
d. May The Legislature Empower The Department Of Natural ResourcesAnd The Commissioner Of Public Lands With Regulatory AuthorityRegarding All Forest Lands In The State Of Washington, IncludingThe Federal Grant Lands, As Well As The Responsibility To ManageThe Federal Grant Lands?
 SHORT ANSWER
The Legislature may lawfully delegate its management and regulatory authority over the state's forest lands to the Department of Natural Resources and the Commissioner of Public Lands.
 ANALYSIS
In considering this question, it is important to understand the relationship between the Commissioner of Public Lands, the Board of Natural Resources, the Department, and the Forest Practices Board.
The Legislature created the Department of Natural Resources in 1957 and assigned to it many responsibilities with regard to the state lands, which include the federal grant lands. RCW 43.30.010, .150; RCW 79.01.004. The Department consists of the Board of Natural Resources, the Commissioner of Public Lands as administrator of the Department, and a supervisor. RCW 43.30.030, .050. The Board consists of the governor or a designee, the superintendent of public instruction, the commissioner of public lands, the dean of the college of forest services at the University of Washington, the dean of the college of agriculture at Washington State University, and a representative of counties with state forest lands acquired or transferred under RCW 76.12. RCW 43.30.040. The Board selects its own chair, and the Commissioner of Public Lands serves as the Secretary of the Board. RCW 43.30.150(9).
In describing the powers and duties of the Board, the Legislature has directed that the Board shall
 (2) Establish policies to insure that the acquisition, management and disposition of all lands and resources within the department's jurisdiction are based on sound principles designed to achieve the maximum effective development and use of such lands and resources consistent with laws applicable thereto; [and]
 (6) Adopt and enforce such rules and regulations as may be deemed necessary and proper for carrying out the powers, duties and functions imposed upon it by this chapter[.]
RCW 43.30.150. Thus, the Board of Natural Resources is largely a policy setting board. WAC 332-10-020(3). In administering the Department, the Commissioner is to conform to policies established by the Board. RCW 43.30.160.
The Commissioner of Public Lands also serves as chair of the Forest Practices Board. RCW 76.09.030(2). Other members of this Board are the director of the Department of Community, Trade, and Economic Development, the director of the Department of Agriculture, the director of the Department of Ecology, an elected member of a county legislative authority appointed by the governor, and six members of the general public appointed by the governor — one of whom owns fewer than 500 acres of forest land and one of whom is an independent logging contractor. RCW76.09.030. The Forest Practices Board is authorized to promulgate forest practices regulations to accomplish the purpose of the Forest Practices Act, which, stated broadly, is to foster the commercial timber industry while protecting the environment. Department of Natural Resources v. Marr, 54 Wn. App. 589, 593,774 P.2d 1260 (1989); RCW 76.09.010. More specifically, the Act's purpose is to maintain a viable forest products industry while protecting forest soils, fisheries, wildlife, water quantity and quality, air quality, recreation, and scenic beauty. RCW76.09.010. As stated earlier, this legislation was enacted pursuant to the Legislature's police power and applies to all of the state's forest lands. The Department of Natural Resources does not have rulemaking authority with respect to forest practices but administers and enforces the rules of the Forest Practices Board. Snohomish Cy. v. State, 69 Wn. App. 655, 665, 850 P.2d 546 (1993), review denied, 123 Wn.2d 1003 (1994); RCW 76.09.040(1).
The universities contend that a conflict of interest is presented by the fact that the Commissioner of Public Lands serves on the Forest Practices Board. They maintain that decisions made by the Commissioner and this board regarding all forest lands may negatively impact the trusts.
This contention seems to suggest that the Commissioner makes policy decisions independent of the Board and is vested with a degree of authority that we do not find apparent. The Commissioner is not the trustee of the federal grant land trusts; rather, the Commissioner is one part of an agency that manages the trusts for the state pursuant to state statute and is one member of a multi-member board with trust management responsibilities. As will be explained shortly, both the Commissioner and the Department fulfill only those responsibilities granted them by the Legislature. We find no legal authority granting the Commissioner power to dictate policy to either the Board of Natural Resources or the Forest Practices Board. The Commissioner is one of six members of the Board of Natural Resources and one of 11 members of the Forest Practices Board. Moreover, with regard to any negative impact that Forest Practices Board regulations may have on the trusts, we again note that the Forest Practices Act is a law of general application enacted pursuant to the police power and that the Forest Practices Board is charged with promulgating rules and regulations to implement that law with respect to all forest lands.
Having clarified the roles and responsibilities of these various entities, we now turn to the more general issue of whether granting the Commissioner and the Department a role in regulating and managing forest lands in general and the federal grant lands in particular, presents an impermissible conflict of interest. The universities suggest that in requiring the Commissioner of Public Lands and the Department to implement statutes not solely concerned with the interests of the trusts, the Legislature has created an impermissible conflict of interest.
In light of the fact that the Enabling Act granted these lands to a sovereign state as trustee, we see no impermissible conflict. This dual role on the part of the state begins at a higher level; it is inherent in the grant.
Both the Enabling Act and the Washington Constitution allow the state to exercise regulatory and managerial authority over the federal grant lands. Section 11 of the Act states that the lands granted may be leased "under such regulations as the legislatures shall prescribe", and section 17 provides that the lands granted therein shall be held, appropriated and disposed of for the purposes mentioned "in such manner as the legislatures of the respective States may severally provide". Article 16, section 3 of the state constitution provides that the state may sell the timber or stone off state lands "in such manner and on such terms as may be prescribed by law".
As stated earlier, the state's police power "exists without express declaration, and the only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state, and not violate any direct or positive mandate of the constitution". Shea v. Olson, 185 Wn. 143, 153, 53 P.2d 615,111 A.L.R. 998 (1936) (cited in Skamania, 102 Wn.2d at 132). Broad discretion is vested in the Legislature to determine what the public interest demands and what measures are necessary to secure and protect that interest. Reesman v. State, 74 Wn.2d 646, 650,445 P.2d 1004 (1968). "Unless the measures adopted by the legislature in given circumstances are palpably unreasonable and arbitrary so as to needlessly invade property or personal rights as protected by the constitution, the legislative judgment will prevail." Reesman, 74 Wn.2d at 650; see also Clark v. Dwyer,56 Wn.2d 425, 431, 353 P.2d 941 (1960), cert. denied, 364 U.S. 932
(1961) (referring to the Legislature as "the chosen representative of the people").
Thus, the authority of the Legislature to manage and regulate state lands in general and the grant lands in particular is evident. As a result, any perceived conflict of interest is inherent and recognized in the grant of these lands, given the state's role as trustee. The state, as a sovereign, cannot simply manage the grant lands and ignore its duty to regulate in the public interest. The Court in Skamania recognized this conflict and found it acceptable, perhaps because it is inevitable. Skamania, 102 Wn.2d at 132-34. The state must continue to exercise its police power even though its exercise may affect the grant land trusts. Moreover, by testing the state's conduct when acting in its trust capacity by fiduciary principles, the law ensures proper motivation and action while leaving the state appropriately less fettered in exercising the police power. If any conflict of interest between regulatory and managerial roles can be said to exist, it is a product of the grant itself. Nothing precludes the Legislature from lawfully delegating its dual trust and regulatory authority to agencies of the state.
The state constitution authorizes the Legislature to delegate authority to the Commissioner of Public Lands. Article 3, section 23 provides that the Commissioner "shall perform such duties . . . as the legislature may direct". The Legislature may also delegate to administrative officers and boards the authority to promulgate rules and regulations to carry out an express legislative purpose, or to affect the operation and enforcement of a law. Senior Citizens, 38 Wn.2d at 153; see also 81A C.J.S. States § 120, at 541 (1977) ("The state determines the authority of its agencies to carry out its governmental powers, and sovereign power is exercised by that portion of the personal [sic] force of the state by which it thinks, acts, determines, and administers, to the end that its constitution may be effective and its laws operative.").
A delegation of authority is lawful if the Legislature has provided general standards which define in general terms what is to be done and who is to do it, and procedural safeguards exist to control arbitrary administrative action. Northwest Gillnetters Ass'n v. Sandison, 95 Wn.2d 638, 646-47, 628 P.2d 800 (1981) (cited in Asarco, Inc. v. Puget Sound Air Pollution Control Agency, 112 Wn.2d 314, 322, 771 P.2d 335, 74 A.L.R.4th 557
(1989)). Having received a lawful grant of authority, an agency must exercise it properly. The power of an administrative agency to promulgate rules is not unlimited. The agency may not legislate and the rules must be within the framework of the policy laid down in the statute. State ex rel. West v. City of Seattle, 50 Wn.2d 94,97, 309 P.2d 751 (1957).
In addition, an administrative agency does not have authority to decline to perform a statutory function. 73 C.J.S. Public Administrative Law Procedure § 63, at 534 (1983). Accordingly, courts can interfere both when there has been a clear abuse of agency discretion or a clear failure to exercise such discretion. Safir v. Gibson, 417 F.2d 972, 978 (2d Cir. 1969), cert. denied,400 U.S. 850 (1970).
In summary, the Legislature has broad discretion to delegate managerial and rule-making authority to state agencies so long as general standards are in place and the resulting agency action can be reviewed. The Forest Practices Act expressly provides for an Appeals Board to hear appeals arising from the Department's actions under the Forest Practices Act. RCW 76.09.220(7). Though the Department's decisions regarding any sale, lease, contract, or other proprietary decision in managing the trust lands do not constitute "agency action" subject to administrative and judicial review under the Administrative Procedure Act, RCW 34.05, the Act allows for judicial review of Department rules. RCW34.05.010(3)(c); RCW 34.05.570(2)(b). Moreover, having been granted dual authority, the Department and the Commissioner cannot decline to exercise it, as demonstrated by the court's memorandum decision in Okanagan Cy. v. Belcher, Chelan Cy. Cause #45-2-00867-9 (5-30-96). The superior court held that while it could not order a discretionary act, the court could order the Department to exercise its discretion where it had a clear duty to act. Consequently, the court ordered the Department to determine whether it is in the best interests of the trusts to harvest damaged timber in the Loomis State Forest pursuant to RCW 79.01.795. Court's Memorandum Decision, at 9.
The roles that the Commissioner plays in regulating forest lands as part of the Forest Practices Board and in managing the trust lands as part of the Board of Natural Resources are different roles. Given the state's status as trustee, this duality is inevitable. Even if the state created an agency devoted exclusively to managing the federal grant lands, that agency nevertheless would be subject to regulations generally applicable to the state lands. The state has the authority to regulate all forest lands in Washington, including the federal grant lands and to manage the grant lands.
 QUESTION 3 IS THE DEPARTMENT OF NATURAL RESOURCES SUBJECT TO THE TRUST PROVISIONS OF RCW TITLE 11? SHORT ANSWER
The Department of Natural Resources is not subject to RCW 11.98, RCW 11.100, RCW 11.106, or RCW 11.110.
 ANALYSIS
RCW 11.98 — Trusts
RCW 11.98 governs trustees in numerous aspects of administering trusts that are subject to its provisions. By its terms, RCW 11.98
applies only to trusts executed after June 10, 1959, and then, only to limited types of such trusts. In this regard, RCW11.98.009 states: "Except as provided in this section, this chapter applies to express trusts executed by the trustor after June 10, 1959[.]" The section goes on to exclude from application of the chapter certain additional trusts, not relevant here, regardless of when they were executed.
The grant land trusts were created by the Enabling Act and the state constitution in 1889. See County of Skamania v. State,102 Wn.2d 127, 132, 685 P.2d 576 (1984). Thus, this chapter does not apply to the Department in administering them. However, as the state agency charged with responsibility for managing these trusts, the Department is subject to common law fiduciary responsibilities. (See response to Question 5 for a full discussion of this point.) As the universities note in materials submitted for our consideration, these common law duties do not depend on the applicability of RCW Title 11.
RCW 11.100 — Investment Of Trust Funds
RCW 11.100 primarily regulates the handling and investment of trust funds. The first section of this chapter, RCW 11.100.010, sets forth its scope. It states:
 Any corporation, association, or person handling or investing trust funds as a fiduciary shall be governed in the handling and investment of such funds as in this chapter specified. A fiduciary who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with requirements of this chapter. The specific requirements of this chapter may be expanded, restricted, eliminated, or otherwise altered by provisions of the controlling instrument.
RCW 11.100.010 (emphasis added).
By virtue of this statute, RCW 11.100 applies to a "corporation, association, or person" engaged as a fiduciary in certain activities involving funds. The Department is an agency of the state, not a corporation or association. Nor is there reason to believe that the Legislature intended the state or its agencies to be included in the meaning of the term "person" under RCW11.100.010.
First, no statute in RCW Title 11 defines the term "person" for purposes of this chapter to include the state or its agencies. By contrast, in the limited circumstances where the Legislature has intended the state to be subject to RCW Title 11 as a trustee, it has made its intent express.
Additionally, the history of RCW 11.100.010 supports the conclusion that the term "person" is not intended to include the state. RCW 11.100.010 derives from Laws of 1955, chapter 33, section 30.24.010, part of "[a]n Act relating to banks and trust companies and other financial institutions; enacting a banks and trust companies code to be known as Title 30 of the Revised Code of Washington". The language of section 30.24.010 as enacted in 1955, was identical to the language now in RCW 11.100.010. However, Title 30, Laws of 1955, also included a definition section that defined the term "person" for purposes of the title as follows:
 Certain terms used in this title shall have the meanings ascribed in this section.
. . . .
 "Person", unless a different meaning appears from the context, shall include a firm, association, partnership, or corporation, or the plural thereof, whether resident, nonresident, citizen or not.
Laws of 1955, ch. 33, § 30.04.010. By virtue of this definition of the term "person", the statutory predecessor of RCW 11.100.010 did not include the state or state agencies.
In 1984, the Legislature substantially revised statutes relating to trusts. Laws of 1984, ch. 149. As part of this revision, RCW 30.24.010, the statutory predecessor of RCW 11.100.010, was decodified and recodified as RCW 11.100.010. The above-quoted section, RCW 30.04.010, defining the term "person" was not recodified. It simply remained in RCW Title 30. Nothing in the House or Senate Journal or the Final Bill Report for these 1984 amendments (ESHB 1213) discloses an intent by virtue of this recodification to expand the meaning of the term "person" in RCW11.100.010 to include the state in administering public trusts.
Moreover, by Laws of 1985, chapter 30, the Legislature revised the 1984 law. The Final Bill Report for this measure, SB 3072, described the thrust of the 1984 revisions, stating:
 In 1984, the Legislature enacted the Washington Trust Act, a major revision of the procedures involved in the operation of private and public charitable trusts[.]
(Emphasis added.) This statement confirms that the 1984 recodification of RCW 11.100.010 was not intended to expand the original reach of the term "person" to include the state or its agencies in the administration of public trusts.
Chapter 11.106 RCW — Trustee's Accounting Act
RCW 11.106 governs actions of "trustees" in accounting for trust property. The term "trustee" is defined for purposes of RCW Title11 by RCW 11.02.005(14). It provides:
 "Trustee" means an original, added, or successor trustee and includes the state, or any agency thereof, when it is acting as the trustee of a trust to which chapter 11.98 RCW applies.
(Emphasis added.)
As previously discussed, RCW 11.98 applies only to certain trusts created after June 10, 1959. RCW 11.98.009. Consequently, the Department is not the trustee of a trust to which RCW 11.98
applies. The grant land trusts were created long before June 10, 1959. In that the Department is not the trustee of a trust subject to RCW 11.98, it is not a trustee for purposes of RCW Title 11 and consequently, is not a trustee for purposes of RCW 11.106.
Chapter 11.110 RCW — Charitable Trusts
RCW 11.110 provides for public supervision over the administration of public charitable trusts. RCW 11.110.010. To accomplish this purpose, the chapter imposes certain reporting obligations on trustees of such trusts. See, e.g., RCW 11.110.060. The chapter expressly excludes from the definition of "trustee" for its purposes, the state and its agencies. RCW 11.110.020. Thus, the Department is not subject to the provisions of RCW 11.110.
Moreover, we note that the very purpose of the charitable trusts statute is to provide governmental supervision over such trusts. This purpose would not be served by applying its provisions to the grant land trusts, as they presently are subject to legislative control and governmental management.
A final observation supporting the conclusion that the Department is not subject to the above-discussed chapters seems appropriate. The Legislature has described in considerable detail the authority and responsibilities of the Department in administering the grant lands. See, for example, RCW 79.01 (the public lands act); RCW 79.14 (governing oil and gas leases); RCW 79.64 (establishing accounts for the management of these lands and prescribing accounting requirements for them); RCW 79.68 (relating to sustained yield management and multiple use of state lands). It would be anomalous to conclude that the Legislature enacted these separate and detailed laws governing the Department's management of these lands, if it intended the Department to administer them according to requirements found in RCW Title 11.
 QUESTION 4 DOES THE DEPARTMENT OF NATURAL RESOURCES HAVE THE AUTHORITY TO ENTER INTO A LONG-TERM AGREEMENT REGARDING MANAGEMENT IN THE FEDERAL GRANT LANDS AS A METHOD OF SATISFYING THE ENDAANGERED SPECIES ACT SHORT ANSWER
The Department has the authority to satisfy the Endangered Species Act by entering into a long-term management plan so long as that plan does not violate the Department's common law or statutory duties regarding the federal grant land trusts. Our recognition of this authority should not be taken as an endorsement of the Department's plan as presently proposed. The propriety of the plan will depend upon its terms and its effect on each of the trusts, and is a determination beyond the scope of this legal opinion.
 ANALYSIS
As a creature of statute, the Department of Natural Resources has only that authority expressly granted by the Legislature or necessarily implied therein. Municipality of Metro. Seattle v. Public Empl. Relations Comm'n, 118 Wn.2d 621, 633, 826 P.2d 158
(1992). Among the Department's powers and duties is the requirement that its Board
 [e]stablish policies to insure that the acquisition, management and disposition of all lands and resources within the department's jurisdiction are based on sound principles designed to achieve the maximum effective development and use of such lands and resources consistent with laws applicable thereto[.]
RCW 43.30.150(2). Moreover, RCW 43.30.135(3)(d) provides that the Department may cooperate with any federal agency in preparing plans "for the protection, management, and replacement of trees, wood lots, and timber tracts". With regard to the school trust lands in particular, RCW 79.01.094 provides that the Department
 shall exercise general supervision and control over the sale or lease for any purpose of land granted to the state for educational purposes and also over the sale of timber, fallen timber, stone, gravel and all other valuable materials situated thereon.
This statute enables the Department to generate income for the trusts by selling to private companies the right to cut timber from the trust lands. Noel v. Cole, 98 Wn.2d 375, 380,655 P.2d 245 (1982); see also County of Skamania v. State, 102 Wn.2d 127,129, 685 P.2d 576 (1984).
The Endangered Species Act of 1973 (ESA) has had a direct impact on timber sales both within and outside the trust lands. Through the ESA, Congress has prohibited any person from "taking" any endangered species and has provided substantial penalties for violating the ESA. 16 U.S.C. §§ 1538(a)(1)(B), 1540. By regulation, the Secretary of the Interior has extended this protection to threatened species. 50 C.F.R. §§ 17.21, 17.31. The ESA defines "taking" as including to "harass, harm, pursue, hunt, wound, . . . or attempt to engage in any such conduct".16 U.S.C. § 1532(19). "Harass" is further defined as an intentional or negligent act or omission that significantly disrupts normal behavior patterns of the endangered animal, while "harm" includes habitat modification that results in actual injury or death to members of an endangered or threatened species.50 C.F.R. § 17.3(c); Babbitt v. Sweet Home Chapter, 515 U.S. ___,115 S.Ct. 2407, 132 L.Ed.2d 597, 610 (1995). The "person" prohibited from engaging in such conduct includes any state agency or instrumentality of any state. "State agency" is defined as any state agency, department, board, commission, or other governmental entity which is responsible for the management of fish, plant, or wildlife resources within a state. 16 U.S.C. § 1532 (13), (18).
Forested lands in Washington contain wildlife species that have been labelled as threatened pursuant to the ESA. These species include the spotted owl and the marbled murrelet, and may soon include some salmonid species as well. Washington Department of Natural Resources, Draft Habitat Conservation Plan, at i (March 1996); Pacific Northwest Generating Coop. v. Brown, 38 F.3d 1058,1061 (9th Cir. 1994). Since the range of the spotted owl includes all of the western part of Washington, as well as portions of the east slope of the Cascades, the range includes some of the federal grant lands. Draft Habitat Conservation Plan, at iii.
The ESA provides for a suspension of activities at such time when operations threaten the continued existence of any endangered species or its habitat. North Slope Borough v. Andrus,642 F.2d 589, 595 (D.C. Cir. 1980). If a lessee's operations become prejudicial to wildlife, the Secretary of the Interior must seek to halt those activities by suing to enjoin or by prosecuting for a "taking". North Slope Borough, 642 F.2d at 595. Furthermore, the ESA requires not only the cessation of harm but the affirmative preservation of an endangered species. Palila v. Hawaii Dep't of Land Natural Resources, 639 F.2d 495, 497 (9th Cir. 1981). As one court stated: "The ESA list is not a list of animals to be written off. It is a mandate for all agencies involved to take aggressive steps to avoid a species' extinction and preserve its viability." Seattle Audubon Soc'y v. Evans, 952 F.2d 297, 302 (9th Cir. 1991).
Despite its emphasis on species preservation, the ESA recognizes the validity of competing interests, and an amendment adopted in 1982 allows states and private parties to apply for permits to "take" listed species. Andrew Smith et al., The Endangered Species Act at Twenty: An Analytical Survey of Federal Endangered Species Protection, 33 Nat. Resources J. 1027, 1064 (1993). Pursuant to this amendment, the United States Fish Wildlife Service, acting as the representative of the Secretary of the Interior, may issue a permit to an applicant to engage in an otherwise prohibited "incidental taking" of an endangered species in accordance with the terms of a habitat conservation plan. Robert Thornton, Searching for Consensus and Predictability: Habitat Conservation Planning Under the Endangered Species Act of 1973, 21 Envtl. L. 605, 624 (1991). A habitat conservation plan details probable impacts and mitigation measures for the proposed taking and justifies selection of the proposed action over less deleterious alternatives. Smith, at 1039; 16 U.S.C. § 1539(a)(2)(A). After a public review period, the Secretary may approve the habitat conservation plan and issue an incidental take permit for the project. Smith, at 1039; 16 U.S.C. § 1539(a)(2)(B).
One case describes the permit requirements as follows:
 First the applicant must submit a comprehensive conservation plan. The Service then must scrutinize the plan and find in order to issue a permit, after affording opportunity for public comment, that (1) the proposed taking of an endangered species will be incidental to an otherwise lawful activity; (2) the permit applicant will minimize and mitigate the impacts of the taking "to the maximum extent practicable"; (3) the applicant has assured adequate funding for its conservation plan; and (4) the taking will not appreciably reduce the likelihood of the survival of the species.
W.W. Dean Assoc. v. City of So. San Francisco, 190 Cal.App.3d 1368,236 Cal.Rptr. 11, 25 (1987) (White, J., dissenting);16 U.S.C. § 1539(a)(2)(B).
The intent of combining an incidental take permit with a habitat conservation plan is to provide "`long-term commitments regarding the conservation of listed as well as unlisted species and long-term assurances to the proponent of the conservation plan that the terms of the plan will be adhered to and that further mitigation requirements will only be imposed in accordance with the terms of the plan.'" Thornton, at 624 (citing 1982 U.S. Code Cong. Admin. News at 2830). If conservation plans address an unlisted species that subsequently is listed as endangered or threatened, under most circumstances no further mitigation requirements will be imposed. Thornton, at 640 (citing 1982 U.S. Code Cong. Admin. News at 2860, 2871). From the land owner's point of view, habitat conservation plans offer an opportunity to finally resolve endangered species issues and avoid multiple successive and conflicting demands to mitigate the impact of development activities on endangered species. Thornton, at 639. Such plans and the permits they produce thus provide the means to develop a trade-off between protecting endangered species and permitting normal development. Sweet Home Chapter v. Babbitt,17 F.3d 1463, 1468 (D.C. Cir. 1994), rev'd. on other grounds,115 S. Ct. 2407 (1995). According to materials submitted by the Department, other forest landowners engaged in habitat conservation planning include the Weyerhauser Company, Plum Creek Timber, Murray Pacific, the Yakama Indian Nation, the Seattle City Water Department, Stinson Tree Farm, the State of Oregon and the Mid-Columbia Public Utility Districts. Department of Natural Resources Annual Report, at 7 (1995).
The Fish and Wildlife Service has the discretion to issue permits of 30 years or more duration, and in determining whether to issue a long-term permit should consider the extent to which the conservation plan is likely to enhance the habitat of the listed species or increase the survivability of the species. Thornton, at 624. The legislative history of the ESA indicates further that permits of 30 or more years "may be appropriate in order to provide adequate assurances to the private sector to commit to long-term funding for conservation activities or long-term commitments to restrictions on the use of land". Richard E. Webster, Comment, Habitat Conservation Plans Under the Endangered Species Act, 24 San Diego L. Rev. 243, 260 (1987). A permit recipient can request a permit modification if circumstances change over the life of the permit. 50 C.F.R. § 13.23. Furthermore, the Secretary of the Interior may revoke a permit at any time if its conditions are not being satisfied, and the permit recipient can cancel a permit on 30 days' notice.16 U.S.C. § 1539(a)(2)(c); 50 C.F.R. § 13.26. As is reflected in the Department's draft implementation agreement, termination of the incidental take permit signals termination of the accompanying habitat conservation plan. Draft Implementation Agreement, at 12. The agreement further provides, however, that the Secretary may require some continuation of a habitat conservation plan's proposed mitigation measures following the cancellation of an incidental taking permit. Draft Implementation Agreement, at 12.
A federal district court in this state recently held that logging may be allowed under the ESA if consistent with the goal of not jeopardizing the continued existence of any endangered species or threatened species or resulting in the destruction or adverse modification of the species' critical habitat. Seattle Audubon Soc'y v. Moseley, 798 F. Supp. 1473, 1483 (W.D. Wash. 1992), aff'd in part, Seattle Audubon Soc'y v. Espy, 998 F.2d 699 (9th Cir. 1993). If the Department attempts to sell timber from trust lands inhabited by threatened species without an incidental taking permit, such sales may be permanently enjoined, thus eliminating the major source of revenue currently available to the grant land trusts. See Marbled Murrelet v. Pacific Lumber Co.,880 F. Supp. 1343, 1367 (N.D. Cal.), aff'd, 83 F.3d 1060 (1996) (permanently enjoining timber harvest by logging company that submitted unreliable habitat conservation plan). In affirming that injunction, the Ninth Circuit held that a reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under the ESA. Marbled Murrelet v. Babbitt, 83 F.3d 1060, 1066 (9th Cir. 1996); see also Sweet Home Chapter v. Babbitt, 30 F.3d 190, 192 (D.C. Cir. 1994), reversed on other grounds, 115 S. Ct. 2407 (1995) (in order for many planned development projects to proceed in compliance with the Act, a permit for incidental take must be obtained).
None of the interested parties who commented on this question disputes the applicability of the ESA to the federal grant lands or the authority of the Department to formulate a habitat conservation plan in response thereto. Rather, some of those parties assert that the habitat conservation plan contemplated by the Department is unreasonable and has been developed without examining the impact that the plan will have on each trust.
This opinion is not intended as an endorsement of the Department's habitat conservation plan as currently before the Board. The question addressed here is simply the Department's authority to enter into a long-term habitat conservation plan, not the merits of the plan now under consideration. The Department does have the authority to enter into a long-term agreement pursuant to the statutes cited earlier, provided such an agreement constitutes a reasonable management plan that serves the interests of each of the federal grant land trusts and is consistent with common law fiduciary duties owed to each trust. In an observation made by the Washington State School Directors' Association relevant to the Department's duty of impartiality, the comparison to be made here is not the relative benefit of the habitat conservation plan as between each trust, but the benefit to each trust of adopting a plan as opposed to the legal consequences of complying with the ESA without a plan. Additionally, any long-term agreement must be sufficiently flexible to allow appropriate alteration and cancellation based on significant potential changes in law or other circumstances in order to protect trust interests. In sum, the Department presently is authorized to satisfy the ESA by entering into a long-term habitat conservation plan if the plan constitutes a reasonable exercise of its discretion and does not breach any of the Department's statutory or common law duties with regard to the federal grant land trusts.
 QUESTION 5 If State Statutes Leave Discretion In The Department Of Natural Resources With Respect To Administration Of Federal Grant Lands, Against What Legal Standards Is The Department's Exercise Of Discretion In The Management Of The Lands Measured? SHORT ANSWER
The Department's exercise of discretion will be tested against an abuse of discretion standard. If a trust beneficiary challenges the Department's exercise of discretion regarding the federal grant lands, principles regarding a trustee's exercise of discretion would apply in reviewing the Department's action. If a nonbeneficiary challenges the Department's action, principles of administrative law regarding abuse of discretion would apply.
 ANALYSIS
Washington statutes vest the Department and the Board of Natural Resources with certain discretionary authority in managing the federal grant lands. As stated above, RCW 43.30.150 provides that the Board shall establish policies to ensure that the acquisition, management, and disposition of all lands and resources within the Department's jurisdiction are based on sound principles designed to achieve the maximum effective development and use of such lands, and that it shall adopt and enforce the rules and regulations necessary to carry out these powers and duties. RCW 43.30.150(2), (6). With regard to the federal grant lands in particular, RCW 79.01.094 provides that the Department shall exercise general supervision and control over the sale or lease for any purpose of land granted to the State for educational purposes and also over the sale of timber and other valuable materials found on such land. While other statutes and regulations limit the ways in which timber may be harvested from state trust lands and the proper means of compensating the individual trusts for the use of their lands, the Department nevertheless exercises some discretion in approving and monitoring such activities. Caffall Bros. Forest Prod., Inc. v. State, 79 Wn.2d 223, 228,484 P.2d 912 (1971) (technical considerations involved in the management and sale of public lands require the development of administrative expertise and judgment that cannot be specifically detailed by statutory prescription); see also State ex rel. Garber v. Savidge, 132 Wn. 631, 634, 233 P. 946 (1925) (commissioner of public lands has authority to determine terms of lease of trust land as well as amount to be paid for timber removed from it). The State Supreme Court has stated more generally that "[a]n agency may fill in the gaps of a statutory framework if necessary to effectuate a general statutory scheme". Asarco, Inc. v. Puget Sound Air Pollution Control Agency, 112 Wn.2d 314, 322,771 P.2d 335, 74 A.L.R.4th 557 (1989).
At the same time, the Department is the instrumentality created to administer and manage the federal grant land trusts for the trustee state. See Department of State Lands v. Pettibone,216 Mont. 366, 702 P.2d 948, 951 (1985); see also Oklahoma Educ. Ass'n v. Nigh, 642 P.2d 230, 235 (1982). As trust manager, the Department is bound by the same fiduciary duties and obligations that bind the state as trustee. See Consolidation Coal Co. v. Utah Div. of State Land Forestry, 886 P.2d 514, 525-26 (Utah 1994); see also State ex rel. Gravely v. Stewart, 48 Mont. 347,137 P. 854, 855 (1913). As stated earlier, however, the Department also must adhere to legislation enacted by the state that affects the federal grant land trusts.
Although all of the submissions we have received recognize that an abuse of discretion standard applies, the parties describe this standard somewhat differently. There are two legal standards against which the Department's discretionary authority may be measured: the discretion granted a trustee, or the discretion granted an administrative agency. The exercise of a power by a trustee is discretionary except to the extent to which its exercise is required by the terms of the trust or by the principles of law applicable to the duties of trustees. Restatement (Second) of Trusts § 187 cmt. a. A trustee abuses its discretion only when it acts arbitrarily, in bad faith, maliciously, or fraudulently. Austin v. U.S. Bank, 73 Wn. App. 293,304, 869 P.2d 404, review denied, 124 Wn.2d 1015 (1994) (citing Occidental Life Ins. Co. v. Blume, 65 Wn.2d 643, 648,399 P.2d 76 (1965)). In determining whether a trustee is guilty of an abuse of discretion in exercising or failing to exercise a power, the Restatement suggests that the following factors be considered:
 (1) the extent of the discretion conferred upon the trustee by the terms of the trust; (2) the purposes of the trust; (3) the nature of the power; (4) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged; (5) the motives of the trustee in exercising or refraining from exercising the power; (6) the existence or nonexistence of an interest in the trustee conflicting with that of the beneficiaries.
Restatement (Second) of Trusts § 187 cmt. d; Austin,73 Wn. App. at 305. In other words, so long as a trustee acts not only in good faith and from proper motives but also within the bounds of reasonable judgment, an abuse of discretion will not be found. III William F. Fratcher, Scott on Trusts § 187, at 14 (4th ed. 1987). It is also important to note, however, that a trustee has no discretion to determine whether he or she will meet the duties of a trustee or satisfy the terms of the trust.
An administrative agency's discretion, on the other hand, is limited by applicable state laws and constitutional provisions. 81A C.J.S. States § 121, at 545. A discretionary decision of an administrative agency is not set aside absent a clear showing of abuse, which in turn is shown by demonstrating that the discretion was exercised in a manner that was manifestly unreasonable or exercised on untenable grounds or for untenable reasons. Schuh v. Department of Ecology, 100 Wn.2d 180, 186, 667 P.2d 64 (1983) (citing Wilson v. Board of Governors, 90 Wn.2d 649, 656,585 P.2d 136 (1978), cert. denied, 440 U.S. 960 (1979)). In assessing a complaint made regarding an administrative agency action, a court may not substitute its judgment for that of the agency; due deference must be given to the "`specialized knowledge and expertise of the administrative agency.'" Schuh, 100 Wn.2d at 187
(citing English Bay Enters., Ltd. v. Island Cy., 89 Wn.2d 16, 21,568 P.2d 783 (1977)).
It thus appears that a somewhat different and broader scope of discretionary authority is vested in an administrative agency acting solely in an administrative capacity as opposed to an administrative agency acting as a trust manager. While the agency must adhere to state law and the trustee to the terms of the trust, the need to fulfill common law duties places an additional constraint on a trustee. As one commentary observes, the courts approach trustees with considerably less deference than they view administrators. "Traditional principles of administrative review favor the administrator; trust law, on the other hand, bends towards protecting the beneficiary and the trustor's intentions from the trustee." Jon A. Souder et al., Sustainable Resources Management and State School Lands: The Quest for Guiding Principles, 34 Nat. Resources J. 271, 295 (1994). This article elaborates on the two different approaches taken toward administrative agencies and trustees:
 The administrator's advantage arises from the fact that the Court must respect agency discretion: it cannot substitute its judgment for the administrator's, and it must defer to the administrator's expertise. . . . The Court's willingness to take a "hard look" at administrative decisions ebbs and flows across time, place, and issue; even when it peaks, however, the Court must respect the agency, its expertise and its discretion.
 The shoe is on the other foot in the case of a trustee. The court seeks specifically to assess whether the trustee has met the "prudent person" standard: did the trustee act with prudence in handling the trust assets? The effect of any apparent or alleged expertise on the part of the trustee is not to insulate his or her decision from scrutiny, but rather to require him or her to meet higher and higher standards of prudence.
Souder, at 295.
Another commentator contends that both standards should and do apply with respect to those agencies placed in charge of administering the school trust lands. Sally Fairfax et al., The School Trust Lands: A Fresh Look at Conventional Wisdom, 22 Envtl. L. 797, 848 (1992). Both articles observe a pattern in the courts' application of the two doctrines. When a commissioner's decision is challenged by a beneficiary, trust principles are the basis for judicial analysis. Conversely, if the decision is challenged by a lessee, the decision relies on agency discretion. Souder, at 295; Fairfax, at 848-49. A sale of trust lands is more likely to be scrutinized under trust principles than is a leasing of such lands. Fairfax, at 849.
In a Utah suit brought by lessees against the state division of state lands and forestry, administrative law clearly governed. Consolidation Coal Co. v. Utah Div. of State Lands Forestry,886 P.2d 514 (Utah 1994). A coal company leasing school land property challenged the board's authority to promulgate its own interest rates and late-payment penalties. After observing that the state's enabling act and constitution required the board to manage the trust lands in the most prudent and profitable manner possible, the court referred to the board's broad statutory grant of authority.
 At all times relevant to this case, the Board had broad discretionary authority over the governance of all state lands, including school trust lands. In particular, the legislature vested the Board with the power to "make and enforce rules and regulations not inconsistent with the provisions of this act for carrying the same into effect." . . . [T]he legislature intended to give the Board particularly wide discretion in the area of state lands. . . . Moreover, as the government entity charged with executing the State's responsibilities as trustee of school trust lands, the Board had "such implied powers as [were] reasonably necessary" to effectuate its constitutional mandate to obtain full value and to prudently and profitably manage school trust lands.
Id. at 526 (citations omitted). The court concluded that the board was empowered to set interest rates and penalties regarding school trust lands. While reference was made to the State's responsibility to the beneficiaries to obtain full value for the school trust lands, the emphasis in the court's analysis clearly was upon administrative law and the discretion afforded an administrative agency. This decision thus fits within the pattern of analysis observed above; that is, that lessee suits are resolved primarily pursuant to administrative law principles. See also Campana v. Arizona State Land Dep't, 176 Ariz. 288,860 P.2d 1341, 1344 (1993) (commissioner has great discretion concerning the disposition of trust lands, and plans for selling, leasing, and using state land will not be overturned absent illegal action, an abuse of discretion, or an unfair bidding); Havasu Heights Ranch Devel. Corp. v. Desert Valley Wood Prod., Inc., 167 Ariz. 383,807 P.2d 1119, 1127 (1990) (state land commissioner has duty to maximize financial benefits flowing from trust but also has discretion to deny lease renewal "in the best interest of the state").
While most of the cases brought by and on behalf of the trust beneficiaries concern state legislation rather than the actions of a state agency, it is clear that courts apply trust principles to beneficiary complaints. See United States v. 111.2 Acres,293 F. Supp. 1042 (E.D. Wash. 1968), aff'd, 435 F.2d 561 (9th Cir. 1970) (holding that granting state school lands to United States for irrigation project would constitute breach of trust); United States v. 78.61 Acres, 265 F. Supp. 564 (D. Neb. 1967) (holding the fact that United States is grantee does not alter principle that res of trust may not be depleted); State v. University of Alaska, 624 P.2d 807 (Alaska 1981) (holding that putting university lands into state park without compensation to the university was a breach of the trust); Kanaly v. State,368 N.W.2d 819 (S.D. 1985) (holding that state must preserve trust fund's principal and thus cannot give away trust property); County of Skamania v. State, 102 Wn.2d 127, 685 P.2d 576 (1984) (concluding legislation modifying contracts for the sale of timber from trust lands violated State's fiduciary duties to trust beneficiaries). Where a claim presents a mix of interests, a combination of the standards reflecting these interests may be appropriate. See State ex rel. Thompson v. Babcock, 147 Mont. 46, 409 P.2d 808, 811-13
(1966); see also State ex rel. Gravely v. Stewart, 48 Mont. 347,137 P. 854, 855 (1913).
It would be a mistake to reject one source of discretionary standards for another in evaluating the actions of the Department of Natural Resources. As stated above, the Department is a government agency with responsibility to manage the federal grant land trusts. Although its role as trust manager should be given primacy whenever a trust beneficiary complains of departmental actions regarding the federal grant lands, its role as administrative agency should govern when an entity other than a beneficiary challenges the Department's actions regarding the grant lands. The actions of the Department may be assessed according to either administrative law or trust law, depending on the context in which they are challenged and the identity of the challenger.
a. To What Extent, If Any, May The Department's Discretionary GrantLand Management Decisions Authorize Approval Of A Management PlanThat Encompasses The Lands Of More Than One Trust, If The TrustsAs A Whole Are Benefited By A Plan, But Individual Trusts AreBenefited Unequally Or May Be Disadvantaged By The Plan?
 SHORT ANSWER
Department management plans need not benefit the trusts equally. It is sufficient that the Department, acting consistently with its fiduciary duties and in the exercise of reasonable judgment determines that on balance, the plan is in the economic interests of each trust. It follows that if the Department, acting consistently with its fiduciary duties and in the exercise of reasonable judgment determines that on balance, a trust would be disadvantaged by the plan, such a trust may not be included in the plan.
 ANALYSIS
The management plan referred to is the Department's proposed habitat conservation plan, which is discussed under Question 4. This plan includes 1.6 million acres of DNR-managed lands which in turn include federal grant lands. Draft Environmental Impact Statement, at 3-1. Each of the trusts enumerated in the Enabling Act has acreage affected by the habitat conservation plan. These lands have been included in the plan because they are within the northern spotted owl's range. As stated, the owl is listed as a threatened species under the Endangered Species Act of 1973.
In essence, the question to be resolved is whether the duty of undivided loyalty a trustee owes to trust beneficiaries prohibits the Department, as trust manager, from making discretionary decisions that may benefit some trusts at the expense of others. A trustee acting for more than a single trust owes to each the same extreme loyalty that a trustee acting for a single trust owes to it. 76 Am. Jur.2d Trusts § 389, at 384 (1992). The trustee must exclude from consideration not only personal advantage or profit, but also any advantage to third parties in dealing with trust properties and in all other matters connected with the administration of the trust estate. Tucker v. Brown, 20 Wn.2d 740,768, 150 P.2d 604 (1944). Third parties would include other trusts administered by the trustee. Restatement (Second) of Trusts § 170 cmt. r. Thus, the duty of loyalty would preclude the Department from administering the federal grant land trusts to benefit some trusts at the expense of others.
The duty of loyalty that a trustee owes to multiple trusts has been compared to the duty to deal impartially with each beneficiary where there are several beneficiaries of a single trust and provides some guidance here. 76 Am. Jur.2d Trusts § 389, at 384; see also IIIA Fratcher, § 232. This duty of impartiality was applied to school land trusts in Bartels v. Lutjeharms, 236 Neb. 862, 464 N.W.2d 321 (1991). In that case, the claim was made that various school districts were being treated differently in violation of the enabling act. The court observed that this argument was based on the correct principle that the school lands are held in trust by the state for educational purposes, and as trustee of the lands and the income therefrom, the state is subject to the standards of law applicable to trustees acting in a fiduciary capacity. Bartels, 464 N.W.2d at 324. The court added that "[f]undamental trust law imposes on the state, as trustee, the duty to deal with all beneficiaries impartially". Bartels, 464 N.W.2d at 324.
A recent addition to the Restatement reflects that this duty of impartial treatment includes a degree of flexibility. The prudent investor rule adopted by the Restatement (Third) of Trusts states that the trustee is under a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would in light of the purposes, terms, distribution requirements, and other circumstances of the trust. Restatement (Third) of Trusts § 227, at 8 (1990). The rule adds that trustees also must conform to the fundamental fiduciary duties of loyalty and impartiality, among others. However, the Restatement further observes that this fundamental duty of impartiality may need to be somewhat flexible because the divergent economic interests of trust beneficiaries give rise to conflicts that cannot be avoided in investment decisions. "These conflicting fiduciary obligations result in a necessarily flexible and somewhat indefinite duty of impartiality. The duty requires the trustee to balance the competing interests of differently situated beneficiaries in a fair and reasonable manner." Restatement (Third) of Trusts § 227 cmt. c, at 13. The Department's discretion to reasonably balance the short term and long term interests of the trusts, discussed in Question 5b, would apply with equal force in this context.
Neither the duty of loyalty to each trust nor the duty of impartiality to balance competing interests in a fair and reasonable manner implies that multiple trusts must be administered in an identical fashion. Consistent with the duty of loyalty, the duty of impartiality means that while the Department may not administer the trusts so that one benefits at the expense of another, the differences among the trusts cannot be ignored, and identical treatment of each is not required.
The commentary provided to us by interested parties reflects these principles. The Universities assert that the Department may not make decisions relative to the federal grant land trusts based on the effects such decisions may have on the trusts as a whole, but must make an independent analysis on behalf of each trust. The Washington State School Directors' Association (WSSDA) agrees that the Department should manage the multiple trusts with an eye to protecting the individual interests of the trusts, but adds that this does not mean that the trusts cannot be affected differently by a single general management plan.
 [T]he fact that one trust may have a greater proportion of its land affected by habitat management practices than another trust is not the measure of the trustee's duty. Rather, the question should be: is the trust better off, when all things are considered, under the habitat management plan than it would have been had there been no plan? For example, if a given trust has a lower volume of harvested timber per acre over the life of the habitat management agreement than another trust, that is not in itself evidence of failure of the trustee to give undivided loyalty to that trust. . . . To some extent the individual trusts must bear the burden of chance which is caused by the interplay of their location and where endangered species choose to live.
WSSDA Commentary, at 4.
In sum, the interests of each trust must be protected, but this does not mean that these interests will be satisfied at the same time and in an identical fashion. So long as each trust is regarded separately and the interests of one are not given precedence over another, the duty of loyalty owed each trust need not include a duty to manage or benefit each trust in exactly the same manner. If, in the exercise of reasonable judgment and consistent with its fiduciary duties, the Department determines that on balance, the economic interests of each trust will be better served under the plan than without it, the Department may authorize approval of a management plan that benefits the individual trusts differently.
b. To What Extent, If Any, May The Department's Discretionary GrantLand Management Decisions Authorize Approval Of A Management PlanThat Exceeds Minimum Standards Governing Use Of The Lands, IfExceeding Those Standards Would Result In A Reduced Short-TermEconomic Return But Promote A Greater Long-Term Economic Return?
 SHORT ANSWER
Department management plans may exceed minimum standards, if doing so reflects a reasonable balancing of short-term interests and the protection of trust productivity over the long term.
 ANALYSIS
At least in part, this question is prompted by concerns that the Board of Natural Resources adopted policies in the 1992 Forest Resources Plan that exceed the minimum regulations required by the Forest Practices Board. WSSDA Commentary, at 5; DNR Commentary, at 31. The Forest Resources Plan guides the Department's forest management activities. The policies at issue protect ecosystem diversity and provide habitat for endangered, threatened, and sensitive species and their habitats. Background and Analytical Framework for the Proposed Draft Habitat Conservation Plan, at 9-10 (1995). The Department contends that the Plan's policies serve the best interests of the trusts by meeting the requirements of the Endangered Species Act and thus providing more certainty and less chance of interruption to the timber sales program. The Department adds that if it operates only at the state forest practices minimum, it risks violating the "take" provisions of the Endangered Species Act. Putting aside the probability of protracted litigation that could adversely affect trust revenue, such a violation could expose the trusts to substantial fines and could prevent the Department from being able to sell timber and produce income for the trusts pursuant to a subsequent habitat conservation plan. DNR Commentary, at 31. The Board thus has adopted forest practices policies that exceed regulatory minimums and which are now part of the proposed habitat conservation plan.
The question presented is whether the Department may adopt a management plan that exceeds minimum standards if doing so results in short-term losses but promotes long-term productivity of the grant land trusts. The tension between current and future beneficiaries has been discussed several times in this opinion. This tension is commonly recognized in treatises discussing the law of trusts, as well as in more specific discussions of the federal grant lands. It is a basic principle of trust law that the trustee's duty to produce current income does not obviate the requirement to protect the trust corpus. Souder, at 297; see also George T. Bogert, Trusts § 106, at 387 (6th ed. 1987) (in performing investment duties, a trustee should consider the purposes of the trust, which are normally the production of a constant flow of income consistent with maintenance of the safety of the principal of the fund, and the preservation of the principal of the trust). Another commentator notes that "apparently competing obligations imposed on state land managers differ little from the competing obligations traditionally visited on private trustees who must be concerned both with income for current beneficiaries and preservation of assets for future beneficiaries". Wayne McCormack, Land Use Planning and Management of State School Lands, 1982 Utah L. Rev. 525, 541. While one authority states that the trustee must not make an investment that will favor one type of beneficiary at the expense of the other, the Restatement provides that the duty of impartiality requires that the competing interests of differently situated beneficiaries be balanced in a "fair and reasonable manner". Bogert, § 106 at 387; Restatement (Third) of Trusts § 227 cmt. c, at 13.
In light of the perpetual nature of the school trusts, there has been a recognition that short-term gain may be compromised to protect long-term productivity where this reflects a reasonable balancing of interests. See National Parks Conservation Ass'n v. Board of State Lands, 869 P.2d 909, 921 (Utah 1993) (beneficiaries of school lands trust are a continuing class and the trustee must maximize the income from school lands in the long run). The Utah Legislature has expressly concluded that the long-term interests of the trust lands must be protected. A Utah statute provides in part that the state, as trustee, must be concerned with both income for current beneficiaries and the preservation of trust assets for future beneficiaries, "which requires a balancing of short and long-term interests so that long-term benefits are not lost in an effort to maximize short-term gains". Utah Code Ann. §53C-1-102.
In the Okanogan County decision cited earlier, the Court observed that the Department's primary concern must be generating maximum income for all of the trust's beneficiaries, current and future.
 To a certain extent, the Department must conserve and enhance natural resources in State forest lands to attain the highest long-term net income from these lands. In exercising its duties, the Department, as trust manager, must act in a manner that is equitable to all generations, including acting reasonably to avoid foreclosing future options of generating income from the trust assets for future generations.
Okanogan Cy. et al. v. Belcher, Chelan Cy. Cause No. 95-2-00867-9 (5-30-96), court's memorandum decision, at 8. The Court concluded that the Department has the duty to maximize revenues from the trust lands in perpetuity for the exclusive benefit of beneficiaries. "There is nothing in the law that requires the Department to maximize current income." Id.
Similarly, the Arizona Court of Appeals held that long-term interests should not be overlooked in an effort to achieve short-term gain in Havasu Heights Ranch Development Corp. v. Desert Valley Wood Products, Inc., 167 Ariz. 383, 807 P.2d 1119
(1990). In Havasu Heights, the state land commissioner denied an existing lessee's application to renew a lease of trust lands because the land was under consideration for urban planning and the current lessee did not represent the type of developer that could achieve the highest and best use of the property. The court upheld the commissioner's decision even though it eliminated current lease revenue to the trust. The court noted that although the commissioner has a duty to maximize the financial benefits flowing from the trust, the commissioner also has the discretion, under Arizona statutory law, to deny renewal of a lease "in the best interest of the state". Havasu Heights, 807 P.2d at 1127. The court held that the commissioner could legitimately consider alternate future uses of state land pursuant to that standard. "The department was concerned with long range development, not merely the availability of a relatively small amount of immediate rental income. This is a legitimate consideration under the `best interest' standard." Havasu Heights, 807 P.2d at 1128; see also State ex rel. Thompson v. Babcock, 147 Mont. 46, 409 P.2d 808
(1966) (upholding land commissioner's decision to deny rental bid higher than current lessee's because high bidder might harm land's productivity in the long run).
Thus, short-term gains may at times be diminished where doing so reasonably balances short-term and long-term interests, particularly with regard to perpetual trusts, such as the federal grant land trusts. If the Department has carefully evaluated the risks and consequences associated with maintaining minimum standards and with exceeding those standards, and is able to demonstrate that management of the federal grant lands to greater than minimum standards is a reasonable balance of short- and long-term interests, such a decision is permissible.
c. To What Extent, If Any, May The Department's Discretionary GrantLand Management Decisions Take Into Account Factors Other Than TheEconomic Well Being Of A Trust, For Example, AdministrativeConcerns Associated With Promoting Flexibility And Stability OfAll Trust Land Management Or Environmental Considerations?
 SHORT ANSWER
In managing the grant lands, the Department may only take into account factors consistent with ensuring the economic value and productivity of the federal grant land trusts.
 ANALYSIS
The parties who supplied us with commentary agree that a trustee may only act on those factors aimed at furthering the purposes of the trusts. Indeed, the parties do not dispute that a trustee must act with undivided loyalty to the trust beneficiaries, to the exclusion of all other interests. Skamania, 102 Wn.2d at 134; Tucker v. Brown, 20 Wn.2d 740, 768, 150 P.2d 604 (1944). "In administering the trust the trustee is under a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust." Restatement (Third) of Trusts § 170 cmt. q, at 140 (1990).
In the context of federal grant land management, the duty of loyalty translates into the requirement that trust lands be managed for the exclusive benefit of the beneficiary institutions and to obtain full value. Kedric A. Bassett, Comment, Utah's School Trust Lands: Dilemma in Land Use Management and the Possible Effect of Utah's Trust Land Management Act, 9 Jour. of Energy Law and Policy 195, 199 (1989). As the Washington State Supreme Court stated in Skamania, "[W]hen the State transfers trust assets such as contract rights it must seek full value for the assets. Const. art. 16, § 1. It may not sacrifice this goal to pursue other objectives, no matter how laudable those objectives may be." Skamania, 102 Wn.2d at 134; see also Oklahoma Educ. Ass'n v. Nigh, 642 P.2d 230, 236 (Okla. 1892) (state must administer school trust lands in manner that obtains maximum benefit from the use of trust property); State ex rel. Ebke v. Board of Educational Lands and Funds, 154 Neb. 244, 47 N.W.2d 520, 523 (1951) (primary purpose of trust is production of income for support and maintenance of state's common schools). The goal of full value need not require an absolute maximization of economic return, however. See Nigh, 642 P.2d at 239 (duty to maintain maximum return subject to taking necessary precaution to preserve trust estate); see also State ex rel. Ebke, 47 N.W.2d at 523 (reasonable precautions should be taken to protect property within the trust).
The Utah Supreme Court recognized the importance of obtaining economic value for trust land beneficiaries in the National Parks decision. At issue was a decision of the Division of State Lands and Forestry to exchange a section of state school land within a national park for county land outside the park. The County wanted the trust land so it could pave part of a trail and improve public access to the scenery of the area. The state school land thus had special scenic value, but the county land for which it was exchanged had greater economic value. An environmental association challenged the exchange. On administrative review, the Director of the Division upheld the land transfer, concluding that the Division could not give priority to scenic, aesthetic, or recreational values because of its fiduciary duty to manage school trust land for the exclusive economic benefit of the common schools. In a passage cited with approval by the Court in the National Parks decision, the Director added:
 To the extent that preservation of non-economic values does not constitute a diversion of trust assets or resources, such an activity may be prudently undertaken. To the extent that . . . the protection of non-economic values is necessary for maximizing the economic value of the property, such protection may be prudently undertaken. When such preservation or protection results in a diversion of assets or loss of economic opportunity, a breach of duty is indicated.
National Parks, 869 P.2d at 916.
The court in National Parks also cited the administrative rule underlying the Director's decision. The Utah rule provided that the general management objective for state lands is to provide for maximum use of natural resources consistent with multiple-use sustained yield principles and proper resource management practices. Rule 632-2-2. In meeting this general objective, the division and board would seek to (1) obtain the greatest possible monetary return for school and institutional trusts consistent with sound management practices, (2) manage trust lands for their highest and best use, and (3) perpetuate the renewable natural resources on state lands using conservation practices. Rule 632-2-2 (cited in National Parks, 869 P.2d at 916 n. 4).
The Utah Supreme Court affirmed the Director's ruling that preference could not be given to scenic, aesthetic and recreational values because of the state's duty to act only for the benefit of the beneficiaries. The court also realized, however, that some trust lands have unique scenic, paleontological and archaeological values that should be preserved. The court suggested that such values perhaps could be preserved without diminishing the economic value of the land by using the land for grazing or mineral extraction. "But when economic exploitation of such lands is not compatible with the noneconomic values, the state may have to consider exchanging public trust lands or other state lands for school lands." National Parks, 869 P.2d at 921. The court observed further that if the state wished to preserve noneconomic values, it might be necessary to buy or lease school lands from the trust so that such values could be preserved and the full economic value of the school trust lands still realized. National Parks, 869 P.2d at 921.
Washington statutes regarding the administration of the federal grant lands also reflect the primary objective of maximizing the economic returns due the benefiting institutions. RCW 43.30.150 makes a general reference to this objective in stating that the Board of Natural Resources shall establish policies to ensure that the management of lands and resources within the Department's jurisdiction are based on sound principles designed to achieve "the maximum effective development and use of such lands". RCW 43.30.150(2). More specifically, RCW 79.01.095 provides that the commissioner of public lands shall cause a periodic economic analysis to be made of those state lands held in trust, "where the nature of the trust makes maximization of the economic return to the beneficiaries of income from state lands the prime objective".
Washington's multiple use statutes also reflect this objective. RCW 79.68.010 directs the Department to employ a multiple use concept in managing and administering state-owned lands within the Department's jurisdiction where multiple use is in the best interests of the state and its citizens, "and is consistent with the applicable trust provisions of the various lands involved". A subsequent statute then lists possible multiple uses "additional to and compatible with those basic activities necessary to fulfill the financial obligations of trust management". RCW 79.68.050. Such uses include recreational areas and trails and the maintenance of scenic and historical sites. "If such additional uses are not compatible with the financial obligations in the management of trust land they may be permitted only if there is compensation from such uses satisfying the financial obligations." RCW 79.68.050.
The above discussion reveals that the Department may consider factors other than the economic well-being of the trusts, such as environmental considerations, but may act on such factors only so long as they do not interfere with the value of the trusts or the economic productivity of the trusts. Though providing economic support to the beneficiaries remains the primary purpose of the Department's responsibilities with regard to the federal grant lands, this purpose does not exclude all other considerations so long as such considerations are consistent with protecting the economic value and productivity of the federal grant land trusts.
 QUESTION 6 Does 7 U.S.C. § 303 et seq. Preclude Charging The Expense Of Managing And Administering The Federal Lands Granted For Purposes Of An Agricultural College Under Section 16 Of The Enabling Act, Against Proceeds Derived From Those Lands? SHORT ANSWER
By virtue of Section 16 of the Enabling Act and 7 U.S.C. § 303, a provision in the first Morrill Act, the state is precluded from charging the expense of managing and administering Section 16 lands against proceeds of the sale of the lands. Proceeds of the sale of the lands include proceeds from the sale of resources that are part of the lands.
 ANALYSIS
This question concerns the relationship between two provisions of federal law: Section 16 of the Enabling Act and 7 U.S.C. § 303, part of the first Morrill Act. Section 16 of the Enabling Act provides:
 That ninety thousand acres of land, to be selected and located as provided in section 10 of this act, are hereby granted to each of said States, except to the State of South Dakota, to which one hundred and twenty thousand acres are granted, for the use and support of agricultural colleges in said States, as provided in the acts of Congress making donations of lands for such purpose.
(Emphasis added.) The lands granted pursuant to section 16 of the Enabling Act have been assigned by the Legislature to the support of Washington State University. RCW 43.79.120.
The above-emphasized reference to acts of Congress making donations of lands for the use and support of state agricultural colleges is a reference to the first Morrill Act. This act was approved by Congress on July 2, 1862, and was amended by an act of July 23, 1866. See, 12 Stat. 503 (1862) and 14 Stat. 208 (1866), respectively. It presently is codified in 7 U.S.C. §§ 301-308.
The first in a series of Morrill acts granted to each state thirty thousand acres of land for each representative and senator the state had in Congress — the grant being for a college primarily devoted to teaching branches of learning related to agriculture and the mechanical arts. State ex rel. Davis v. Clausen, 160 Wn. 618,634, 295 P. 751 (1931). Under certain circumstances, land scrip was issued in lieu of lands. 7 U.S.C. § 302.
At its first session, the Washington Legislature established the Washington State Agricultural College School of Science. Laws of 1889-90, p. 260. That it did so in part to take advantage of the land grant made in section 16 of the Enabling Act and that it recognized the applicability of the first Morrill Act is supported by the fact that the law recites the substance of the Section 16 land grant and refers to the first Morrill Act in its preamble. Laws of 1889-90 at page 260. See also State ex rel. Davis v. Clausen, 160 Wn. at 632 ("It is undoubtedly true that the legislature established the state college for the purpose of obtaining the benefit of these congressional grants[.]").
Similarly, in 1891, the Legislature provided for an experiment station in connection with the college and for the location and maintenance of each. Laws of 1891, ch. 145, § 1, p. 334. In section 10 of this measure, the Legislature again referred to the Morrill Act stating:
 The said college and experiment station shall be entitled to receive all the benefits and donations made and given to similar institutions of learning in other states and territories of the United States, by the legislation of the congress of the United States now in force or that may be enacted; and particularly to the benefits and donations given by the provisions of an act of congress entitled "An act donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and mechanic arts," approved July 2, 1862, and all acts supplementary thereto[.]
Laws of 1891, ch. 145, § 10, p. 337 (emphasis added).
As previously noted, the foregoing reference to the act "approved July 2, 1862," is a reference to the first Morrill Act.
From this language and history, we conclude that, in stating that the granted lands are for the use and support of agricultural colleges "as provided in the acts of Congress making donations of lands for such purposes", Section 16 of the Enabling Act adopted by reference the terms of the first Morrill Act. This conclusion reflects the plain language of Section 16 and the ordinary function of a reference statute. It also is consistent with decisions of the Supreme Court of Montana, a state admitted to the Union under the same Enabling Act as Washington. The Montana Supreme Court has held that the land grant in Section 16 of the Enabling Act was made subject to the provisions of the Morrill Act. State ex rel. Koch v. Barrett, 26 Mont. 62, 66 P. 504, 506
(1901); State ex rel. Blume v. State Bd. of Educ., 97 Mont. 371,383, 34 P.2d 515 (1934).
In materials submitted for our consideration in connection with this opinion, the Department suggests that the first Morrill Act assumed that the states would sell the land or land scrip granted to them, that Congress did not contemplate that some states, such as Washington, would retain these lands and manage them as income producing assets and that consequently, the Act should be found not to apply to these lands. As the Montana court explained in State ex rel. Koch v. Barrett:
 By reference to the Act of congress of July 2, 1862, and particularly section 4 thereof, it will be seen that it was contemplated by congress that the lands granted by the Enabling Act should be sold; that the proceeds should be profitably invested, so that the principal should be forever preserved as a permanent endowment fund; and that the interest thereof should be devoted to the support of the college or colleges established pursuant to the declared purpose of the grant.[11]
Koch, 26 Mont. at 64.
Although in 1862, Congress may have contemplated that these lands would be sold, it also is true that in 1889, when Washington's Enabling Act was drafted referencing the Morrill Act, Congress contemplated that lands granted for educational purposes could be leased. See Enabling Act § 11 (authorizing the lease of such lands). See also State ex rel. Heuston v. Maynard, 31 Wn. 132,139-40, 71 P. 775 (1903) (holding that the reference in section 11 of the Enabling Act to lands granted for educational purposes applies to all such lands, not merely common school lands). Similarly, in accepting the lands granted by virtue of the Enabling Act, including Section 16 lands, this state contemplated that not all of the lands would be immediately sold. See Const. art. XVI, § 3 (providing that not more than one-fourth of the lands granted for educational purposes would be sold prior to January 1, 1895 and not more than one-half prior to January 1, 1905). The same provision authorized the sale of timber and stone from such lands. Nothing in the state constitution required the state to sell the granted lands.
State ex rel. Forks Shingle Co., 196 Wn. at 501; AGO 1984, No. 24, p. 9.
In light of the relevant language of the Morrill Act and this history, we cannot conclude that 7 U.S.C. § 303 is rendered inapplicable to Section 16 lands simply because Washington may have retained certain Section 16 lands and managed them for the production of income. Rather, guided by the general purpose of the grant, we conclude that the first Morrill Act applies regardless of whether the state has retained Section 16 lands on a long term basis.
The Montana Supreme Court was similarly guided in State ex rel. Koch v. Barrett. There, the Montana constitution and statutes authorized leasing of Section 16 lands. The State of Montana argued that revenues from the lands granted pursuant to Section 16 of the Enabling Act and subject to the terms of the Morrill Act became available for the support of the land grant college only after the lands were sold and the sale proceeds invested. The Montana Supreme court rejected this argument and in doing so, was guided by the general purpose of the grant. The Montana court explained:
 We think the manifest intention of congress was to create a permanent endowment, which was to be preserved inviolate; and to require that the revenues derived therefrom should be faithfully applied to the support of the institutions created, and not be diverted to other purposes. . . . The grant was made in view of conditions existing at the time, and others which might arise. It certainly could not have been intended that lands which could not be readily and speedily sold, but which, from their character and situation, could be made to yield a revenue by a system of leasing, should be allowed to lie idle and unprofitable until such time as the state could sell them, and thus comply with the strict letter of the grant.
Koch, 26 Mont. at 70.
We now consider the effect of section 3 of the first Morrill Act, codified at 7 U.S.C. § 303. This provision has remained unchanged since its enactment in 1862. It provides:
 All the expenses of management, superintendence, and taxes from date of selection of said lands, previous to their sales, and all expenses incurred in the management and disbursement of the moneys which may be received therefrom, shall be paid by the States to which they may belong, out of the treasury of said States, so that the entire proceeds of the sale of said lands shall be applied without any diminution whatever to the purposes hereinafter mentioned.
7 U.S.C. § 303 (emphasis added).
The initial language of 7 U.S.C. § 303 provides that all expenses of management from the date of selection of these lands prior to their sales shall be paid by the states to which they belong out of the treasuries of such states. However, 7 U.S.C. § 303 also contains a qualifying phrase — "so that the entire proceeds of the sale of said lands shall be applied without any diminution whatever to the purposes hereinafter mentioned".
Where a qualifying phrase is separated from its antecedents by a comma, as is the qualifying phrase in § 303, it indicates that the qualifying language applies to all antecedents, not simply to the immediately preceding antecedent.
 Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma.
2A N. Singer, Statutory Construction § 47.33 (4th ed. Supp. 1981); In re Sehome Park Care Center, 127 Wn.2d 774, 781-82, 903 P.2d 443
(1995); Elliot Coal Mining Co. v. Director, Office of Workers' Compensation Programs, 17 F.3d 616, 629-30 (3rd Cir. 1994).
Under this rule, the qualifying phrase of § 303 relates to the requirement that all management expenses prior to sale be paid by the states from their treasuries. Although this grammatical rule standing alone, would not be clearly determinative in interpreting this statute, this interpretation also is consistent with the intent of Congress.
As previously noted, at the time Congress adopted the first Morrill Act in 1862, it apparently contemplated that the lands granted in the Act would be sold and that the funds derived from them would be used to support the institutions benefiting from the grant. In the context of these anticipated events, Congress quite clearly wished to ensure that proceeds from the sale of the lands granted pursuant to the Morrill Act would be used for the support of the beneficiary agricultural colleges without any deduction for land management of fund management expenses. Protection of the whole of such land sale proceeds was the focus of § 303. A decision of New York's highest court relating to the first Morrill Act, People ex rel. Cornell University v. Davenport, 117 N.Y. 549,23 N.E. 664 (1890) identifies this purpose. In Davenport, the court considered whether the state could charge costs associated with investing the proceeds of land and scrip received pursuant to the Morrill Act against funds derived from their sale or against interest earned on the funds. Although the New York court based its decision on state statutes, the court determined their meaning by looking to the provisions and purposes of the Morrill Act. In considering the Morrill Act, the court stated:
 The clear purpose of the act of congress cannot be mistaken. It was to provide a fund from the sale of the public lands or of the land scrip, of which the state should be the trustee, and the safety of which should be guarantied by it, and the whole interest of the principal sum was to be used for the purposes mentioned in the act, without the deduction of any costs, charges, or expenses of any name or nature. The whole actual earning of the fund was to be used for this purpose, and all expenses of management or disbursements were to be paid by the state which received the donation, so that, in the language of the federal legislature, "the entire proceeds of the sale of said lands shall be applied, without any diminution whatever, to the purposes" thereinafter mentioned.
Davenport, 23 N.E. at 667.
In this passage, Davenport recognizes that the intent of Congress in enacting the first Morrill Act was to ensure that the full proceeds received on sale of the granted lands were made available for the agricultural colleges, without deduction of management expenses.
We thus conclude that the state may not deduct land management expenses from the proceeds of the sale of lands granted pursuant to the first Morrill Act. We next consider what constitutes "proceeds of the sale of such lands" within the meaning of § 303 — "so that the entire proceeds of the sale of said lands shall be applied without diminution whatever to the purposes hereinafter mentioned".
Our analysis on this point begins with the rule that statutes and words within them, should be construed in light of the context and purpose of the statutory scheme. In re Marriage of Kovacs,121 Wn.2d 795, 854 P.2d 795 (1993); In re Mitchell, 977 F.2d 1318 (9th Cir. 1992). In this regard, we first note that by the Morrill Act, Congress did not grant only bare ground. Lands granted by the Act included natural resources that comprised a part of the lands and that contributed to their value. Amounts derived from the sale of the lands would include amounts attributable to such resources. The Morrill Act directs that this full amount be used for the beneficiary agricultural colleges, without diminution for management expenses.
Second, the ordinary meaning of the term "lands" would include such resources. In Island County v. Dillingham Development Co.,99 Wn.2d 215, 662 P.2d 32 (1983), the State Supreme Court considered the meaning of the term "land" in a statute that exempted 5-acre divisions of land from platting requirements. The county argued that the exemption should not apply because major portions of the claimed 5-acre parcels were under water, as part of the bed of a lake. The Supreme Court rejected the county's position:
 As the term "land" is not defined in the State's platting act or in the County's subdivision ordinance, we must accord this term its ordinary meaning. [cite omitted]. Black's Law Dictionary 1019 (4th rev. ed. 1968) gives the following legal definition of "land":
 "Land" includes not only the soil or earth, but also things of a permanent nature affixed thereto or found therein, whether by nature, as water, trees, grass, herbage, other natural or perennial products, growing crops or trees, mineral under the surface, or by the hand of man, as buildings, fixtures, fences, bridges, as well as works constructed for use of water, such as dikes, canals, etc.
 (Italics ours.) We conclude the definition of "land" within the ordinance includes that part of the lots under water.
Island County, 99 Wn.2d at 224.
Additional cases stand for a similar proposition. For example, Layman v. Ledgett, 89 Wn.2d 906, 911, 577 P.2d 970 (1978) recognizes that uncut timber is realty, a part of the land. See also United States v. Shoshone Tribe, 304 U.S. 111, 116,58 S.Ct. 794, 82 L.Ed. 1213 (1938) ("Minerals and standing timber are constituent elements of the land itself.").
In our opinion, the qualifying phrase of § 303 — "so that the entire proceeds of the sale of said lands shall be applied without any diminution whatever to the purposes hereinafter mentioned", when considered in its historical context, similarly includes proceeds from the sale of natural resources that are part of such lands. Such a definition of "land" not only reflects an ordinary meaning given the term, it also furthers the purpose of the grants insofar as Congress contemplated the circumstances in adopting the Act — i.e., that all revenues generated by the sale of the lands, including revenues reflecting the value of resources that were part of the lands, would be applied without diminution, to the purposes of the Act.
A decision of the Kansas Supreme Court in a case interpreting the first Morrill Act further supports this conclusion. In State ex rel. Fatzer v. Board of Regents, 176 Kan. 179, 269 P.2d 425
(1954), the state of Kansas sought to prevent the Board of Regents of Kansas State College, the state agricultural college receiving the benefit of the Morrill Act grant, from expending certain proceeds of oil and gas leases from such lands for the purpose of building dormitories. The state's action was based on section 5 of the first Morrill Act, codified at 7 U.S.C. § 305, which provides in part:
 No portion of said fund, nor the interest thereon, shall be applied, directly or indirectly, under any pretense whatever, to the purchase, erection, preservation, or repair of any building or buildings.
(Emphasis added.) The court held that the fund referenced in and restricted by this provision is the fund derived from the sale of Morrill Act lands under 7 U.S.C. § 303, the provision at issue in this question. Fatzer, 269 P.2d at 432 ("Obviously this fund is the fund that is obtained from the sale of lands for agricultural purposes."). Having so concluded, the court found the determinative issue to be whether the oil and gas lease constituted the sale of land under Section 4 of the Morrill Act,7 U.S.C. § 303, so that the prohibition of § 305 would apply. The court determined that royalties derived from the oil and gas lease constituted proceeds from the sale of such lands, explaining that royalties represent value taken from the land. "The oil and gas in place is real estate and when taken out the value thereof is reduced by so much." Accordingly, the court held that the royalties constituted proceeds from the sale of land and could not be used to pay for construction of dormitories by virtue of the prohibition contained in 7 U.S.C. § 305. Fatzer, 269 P.2d at 434.
The Fatzer court recognized, as does this opinion, that resources such as oil, gas, and timber that are part of the land often represent a substantial portion of the value of the land and that consequently, their sale diminishes that value. The purpose of the Morrill Act — ensuring that the full proceeds of the sale of the lands be made available to the beneficiary agricultural colleges, without deduction of management expenses — could be largely defeated by charging land management expenses against the proceeds of the sale of resources comprising a part of the lands.
For this reason as well as those discussed above, we conclude that7 U.S.C. § 303 prohibits the state from deducting the expenses of managing Section 16 lands from proceeds derived from the sale of those lands and that land sale proceeds include proceeds from the sale of resources that are part of the lands.
In light of our answer to this question and the Legislature's request that as appropriate, this opinion comment on the validity of existing statutes, we offer the following comments. RCW79.64.030 and RCW 79.64.040, govern the resource management cost account. These statutes appear to authorize deduction of expenses for managing agricultural college lands from proceeds derived from the sale of those lands. To the extent that the referenced agricultural college lands are Section 16 lands, deduction of land management expenses from land sale proceeds is impermissible under Section 16 of the Enabling Act and the first Morrill Act which Section 16 incorporates by reference.
 FOREST BOARD TRANSFER LANDS GENERAL BACKGROUND
We now consider the Legislature's questions relating to "forest board transfer lands". In considering these questions, it is important to begin with an understanding of the nature and source of these lands. Forest board transfer lands are public lands held and managed by the Department of Natural Resources in trust by virtue of RCW 76.12.030.
These are lands chiefly valuable for developing and growing timber. They were acquired by counties through tax lien foreclosures and transferred to the Department on demand, for state forest lands, under the terms of RCW 76.12.030.
Much of the land acquired by the state under this statute was acquired in the 1930s and was land that had been logged over or burned over and abandoned by private owners, including timber companies that simply cut existing timber and moved on to another stand. After abandonment, the lands became subject to foreclosure by the county for delinquent state and local property taxes. The transfer of these lands to the state for state forest lands was designed to promote reforestation, important to Washington's economy, and to provide protection from wildfires. Jon A. Souder Sally K. Fairfax, State Trust Lands: History, Management 
Sustainable Use, at 155-156 (1996); Department of Natural Resources, State Forest Board Lands: A Report to The Counties, at 16-23 (1987).
RCW 76.12.030, the statute providing for the transfer of these lands and the manner in which they are to be administered, states:
 If any land acquired by a county through foreclosure of tax liens, or otherwise, comes within the classification of land described in RCW 76.12.020 and can be used as state forest land and if the department deems such land necessary for the purposes of this chapter, the county shall, upon demand by the department, deed such land to the department and the land shall become a part of the state forest lands.
 Such land shall be held in trust and administered and protected by the department as other state forest lands. Any moneys derived from the lease of such land or from the sale of forest products, oils, gases, coal, minerals, or fossils therefrom, shall be distributed as follows:
 (1) The expense incurred by the state for administration, reforestation, and protection, not to exceed twenty-five percent, which rate of percentage shall be determined by the board of natural resources, shall be returned to the forest development account in the state general fund.
 (2) Any balance remaining shall be paid to the county in which the land is located to be paid, distributed, and prorated, except as hereinafter provided, to the various funds in the same manner as general taxes are paid and distributed during the year of payment: Provided, That any such balance remaining paid to a county with a population of less than nine thousand shall first be applied to the reduction of any indebtedness existing in the current expense fund of such county during the year of payment.
RCW 76.12.030.
This statute refers to and applies to lands "within the classification of land described in RCW 76.12.020". The classification of land described in RCW 76.12.020 is land "chiefly valuable for [the] purpose of developing and growing timber". The above-quoted statute also provides that prior to demanding transfer of such land, the Department must deem the land "necessary for the purposes of this chapter". The purposes of the chapter, as set forth in RCW 76.12.020, are promoting reforestation and developing and growing timber.
Under RCW 76.12.020, upon approval of the board of county commissioners of the county in which the land is located, the Department also may accept donations of lands chiefly valuable for growing and developing timber, subject to delinquent taxes on the lands. If the Department acquires such lands, all delinquent general taxes on the lands, except state taxes, are cancelled. RCW 76.12.020 directs the Department to hold these lands in trust and protect, manage, and administer them and dispose of proceeds from them under RCW 76.12.030. See Laws of 1937, chapter 172, section 1, which added this provision to the law.
By contrast, the Department also holds state forest land that it acquired by outright gift or purchase. These lands often are referred to as forest board purchase lands. By virtue of RCW 76.12.120, counties and other taxing districts receive a certain portion of revenues from these lands. However, unlike RCW 76.12.030, none of the statutes governing the forest board purchase lands or distributions from them provide that they are held in trust. RCW 76.12.020, .080, .120. The following discussion of trust principles relates only to forest board transfer lands — i.e., lands held in trust by virtue of language so providing in RCW 76.12.030. Such principles do not apply to forest board purchase lands, as no constitutional or statutory trust exists with respect to them.
 QUESTION 1
To What Extent Is State Legislative Authority With Respect ToForest Board Lands Constrained By Common Law Principles GoverningThe Administration Of Private Trusts?
 SHORT ANSWER
The forest board transfer lands are held in trust pursuant to a legislative enactment. As a statutory trust, it may be altered or repealed by the Legislature. However, as long as the statutory trust exists, common law principles governing the administration of private trusts apply to the extent that such principles are not inconsistent with statutory directives.
 ANALYSIS
This question concerns the legislative authority of the state and consequently, this analysis begins with fundamental legal principles relating to this authority. The legislative power of the state is circumscribed only by the state and federal constitutions. It is not circumscribed by state statutes. It is not circumscribed by the common law. The Legislature may enact any law not expressly or inferentially prohibited by the federal or state constitutions. Overlake Homes, Inc. v. Seattle First Nat'l Bank, 57 Wn.2d 881, 884, 360 P.2d 570 (1961); see also RCW4.04.010 (recognizing that the common law is the rule of decision in this state only insofar as the common law is not inconsistent with state statutes).
This same broad legislative authority exists as to legislation governing or affecting the interests of local governments, including counties. Legislative authority over counties and other political subdivisions of the state is unlimited, except as a limitation is found in the state constitution. State ex rel. Board of Comm'rs v. Clausen, 95 Wn. 214, 223, 163 P. 744 (1917). "[P]olitical subdivisions of a state are created as convenient agencies for exercising such governmental powers of the state as may be entrusted to them. Thus, the state may, at its pleasure, modify or withdraw such powers, may take without compensation such property, hold it itself, or vest it in other agencies." Moses Lake Sch. Dist. 161 v. Big Bend Comm'ty College, 81 Wn.2d 551,557, 503 P.2d 86 (1972), appeal dismissed, 412 U.S. 934 (1973); see Douglas Cy.v. Grant Cy., 72 Wn. 324, 332, 130 P. 366 (1913).
Finally, it is well established that the state's legislative authority with respect to collection of taxes is equally broad. The tax collection process is an essential and basic attribute of sovereignty and, subject to constitutional limitations, rests with the Legislature. Commercial Waterway Dist. 1 v. King Cy., 10 Wn.2d 474,478, 117 P.2d 189 (1941); Gilbreath v. Pacific Coast Coal 
Oil Co., 75 Wn.2d 255, 259, 450 P.2d 173 (1967).
These principles are important in analyzing this question for several reasons. First, unlike the federal grant land trusts, the forest board transfer land trust is created by statute. It has no origin in the state constitution. Any common law fiduciary obligations stemming from this trust, like the trust itself, are products of statute, subject to modification by the Legislature. Second, in addition to promoting reforestation, the statutes creating these trusts provide for revenue distribution to counties and other taxing districts under circumstances where property tax revenues that would have been generated by these lands had they remained on the tax rolls, have been lost. RCW 76.12.020, 030.
In light of these principles, this opinion concludes that the legislative authority of the state with respect to forest board transfer lands generally is not constrained by common law fiduciary principles governing administration of private trusts. This conclusion fully comports with the Skamania decision (County of Skamania v. State, 102 Wn.2d 127, 685 P.2d 576 (1984)), as is demonstrated below.
In Skamania, a county for which the state held forest board transfer lands under RCW 76.12.020 and beneficiaries of the federal grant land trusts challenged the Forest Products Industry Recovery Act of 1982 on numerous constitutional grounds. As previously explained, the Recovery Act released private timber companies from performance of state timber purchase contracts that had become uneconomical to them and released the state's claims based on those contracts.
Virtually the entire opinion in Skamania discusses the state's obligations with respect to the federal grant lands and case law principles developed regarding the federal grant lands. As to these lands, the State Supreme Court affirmed the trial court's conclusion "that the Act is a breach of the State's fiduciary duty under Const. art. 16, § 1". Skamania, 102 Wn.2d at 139. At the same time, the Skamania court recognized that unlike the federal grant land trusts, created by the Enabling Act and constitutional provision, the forest board transfer land trust was created by statute, RCW 76.12.030:
 The forest board transfer lands are also held by the State in trust. RCW 76.12.030 states that when counties transfer this land to the state, "[s]uch land shall be held in trust and administered and protected by the board as other state forest lands." This statute, like the enabling act, imposes upon the State similar fiduciary duties in the management and administration of the forest board transfer lands.
Skamania, 102 Wn.2d at 133.
In this passage, the Skamania court acknowledges that common law trust principles relating to the forest board transfer land trust are of statutory, not constitutional, derivation and stature. Because these common law fiduciary principles are not of constitutional significance with respect to the forest board transfer lands, they do not constrain the legislative authority of the state. Under the principles discussed above, this trust and its attendant common law fiduciary principles may be altered or repealed through exercise of legislative authority.
Similarly, nothing in Skamania's discussion of forest board transfer lands suggests that the Legislature could not abolish the trust created by RCW 76.12.030 or alter its terms. Indeed, the Legislature has amended RCW 76.12.030 on numerous occasions since it first was enacted in 1927. See Laws of 1935, ch. 126, § 1; Laws of 1951, ch. 91, § 1; Laws of 1957, ch. 167, § 1; Laws of 1969, ch. 110, § 1; Laws of 1971, Ex. Sess., ch. 224, § 1; Laws of 1981, 2nd Ex. Sess., ch. 4, § 4; Laws of 1988, ch. 128, § 24; Laws of 1991, ch. 363 § 151.
Skamania's holding that the federal grant land trusts are subject to fiduciary principles by virtue of the Enabling Act and the state constitution would not and did not provide the basis for affirming the trial court as to the forest board transfer lands. The basis for the State Supreme Court's decision in this respect is not entirely clear from its opinion. It becomes clear when one considers the argument advanced by Skamania County and the superior court's ruling reviewed and affirmed in Skamania.
The County's challenge in Skamania was not predicated on an assertion that the legislative authority generally is restricted with regard to these lands. In its trial brief in Skamania, the County of Skamania explained:
 While in the abstract it might be argued that a trust created by statute can be revoked by statute as well, the State has conceded that the Act has not had that effect. In fact, it was necessary for the state to argue that the "state-county relationship under RCW 76.12.030 . . . has not been changed" in order for the state to prevail on its motion for summary judgment. See State's Reply Memorandum re Partial Summary Judgment, p. 7. Otherwise, the Act would have been unconstitutional for failing to set forth in full a statute being amended by the Act. See Plaintiff's Memo Against Summary Judgment, pp. 27-8.
County of Skamania, et al. v. State of Washington, Clark County Superior Court No. 82-2-01875-2, Plaintiff's Trial Brief, pp. 35-36.
The complaint filed in Skamania also reflected this position, alleging among other things, that the Recovery Act amended RCW 76.12.030 without setting it forth in full and therefore violated article 2, section 37 of the Washington State Constitution. See Complaint For Declaratory Judgment, Clark Cy. Sup. Ct. No. 82-2-01875-2, p. 9, ¶ 5.6. Article 2, section 37, of the Washington Constitution provides:
 No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length.
In an order granting partial summary judgment to the State of Washington in Skamania, the superior court concluded that the Recovery Act did not violate this provision. Order Granting State Of Washington's Motion For Partial Summary Judgment, Clark Cy. Sup. Ct. No. 82-2-01875-2, ¶ 2. Based on this ruling of the superior court, the County of Skamania thereafter modified its argument. It argued that since the Recovery Act did not amend RCW 76.12.030, the provisions of the statute remained in force and the County was entitled to the benefit of the trust RCW 76.12.030 created, including common law fiduciary duties of loyalty and prudence ordinarily applicable to trusts. See Brief of Respondents County of Skamania, et al., Supreme Court No. 49799-1, pp. 36-39; Plaintiff's Trial Brief, Clark Cy. Sup. Ct. No. 82-2-01875-2, pp. 35-36. As an alternative matter, the County continued to argue that if the Recovery Act amended RCW 76.12.020, then it violated article 2, section 37 of the state constitution. See Brief of Respondents County of Skamania, et al., Supreme Court No. 49799-1, pp. 39-42.
The superior court's conclusions with respect to these issues are reflected in its decision. Conclusions of Law A.4. and A.5. state:
 4. RCW 76.12.030 provides that certain land conveyed to the state by the counties shall be "held in trust." The court concludes that this, too, is a real, enforceable trust, and that the counties making such conveyances retain a beneficial interest in the land as long as it is held in trust.
5. The court holds that the Act does not amend RCW 76.12.030.
See County of Skamania, et al. v. State of Washington, Clark Cy. Sup. Ct. No. 82-2-01875-2, Findings of Fact and Conclusions of Law.
In summary, in Skamania, the superior court concluded that RCW 76.12.030 created the forest board transfer lands trust, that counties retained a beneficial interest in the land as long as it was held in trust, and that the Recovery Act did not amend RCW 76.12.030. On appeal, the state challenged these conclusions of law of the superior court. See, Brief of Appellant State of Washington, Supreme Court No. 49799-1, p. 8. The State Supreme Court denied the state's challenge and affirmed the superior court. Skamania, 102 Wn.2d at 128.
Skamania stands for the proposition that where the Legislature has created state trust lands, the Court will give effect to legislation specific to those trust lands that does not amend the trust, only if the legislation is consistent with the terms of the trust. As is discussed more fully in response to the next question, the terms of the trust include fundamental common law fiduciary principles incorporated by the statute creating the trust and not altered or displaced by statutes governing the trust.
The County's argument in Skamania and the superior court's ruling affirmed in Skamania support this conclusion. This conclusion also is consistent with the holding of the State Supreme Court in Skamania and gives effect to its recognition of the significantly different origins of the trusts before it and its reaffirmation of the fundamental principles discussed in this analysis.
This opinion next responds to a related subsidiary question posed by the Legislature.
Is the administration of these lands subject to laws ofgeneral application?
 SHORT ANSWER
The Legislature is free to enact laws of general application unconstrained by common law fiduciary principles.
 ANALYSIS
As previously discussed, Skamania also reaffirmed the broad police power authority of the Legislature in enacting laws of general application. This holding of Skamania applies with greater force to the statutorily created forest board transfer lands trust. Skamania, 102 Wn.2d at 132. To the same effect are the numerous cases discussed in this opinion in response to Question 2(a), relating to the federal grant lands. We know of no principle suggesting that the trust status of property frees that property or those charged with administering it from laws of general application simply because those laws may affect the value of trust assets or entail costs to the trust.
In summary then, the forest board transfer lands trust is a creature of statute. The Legislature may alter or repeal this statutory trust, provided that it does so in a manner consistent with constitutional requirements, including article 2, section 37, of the Washington Constitution. This statutory trust does not constrain the authority of the Legislature in enacting laws of general application.
 QUESTION 2 To What Extent Do Common Law Trust Principles Apply To The Administration Of The Forest Board Transfer Lands By Virtue Of The Statutes Governing The Lands? SHORT ANSWER
Common law fiduciary principles apply to the Department in managing the forest board transfer lands to the extent that such principles are not inconsistent with statutes establishing the terms of the trust. The Department is to look first to statutes governing these lands and follow their direction. Where the statutes are silent, common law fiduciary principles apply in managing and administering the lands.
 ANALYSIS
As discussed at some length in response to Question 1, the forest board transfer lands are held in trust by virtue of statute, RCW 76.12.030. To the extent the Legislature has prescribed the Department's authority and responsibility in administering this trust, the Legislature's prescription is controlling.
As a leading legal commentator on the law of trusts explains:
 Some . . . statutes . . . not only create or provide for the creation of trusts, but also give some details as to the method of execution of the trusts, such as the trustee's duties as to the disposition of the funds, accountings, and termination. To this extent these statutory trusts are not normal trusts, and the general trust principles discussed in this treatise do not apply to them.
George G. Bogert, The Law of Trusts and Trustees § 246, at 150 (2nd rev. ed. 1992).
This rule would apply not only as a matter of legislative authority, but also under common law trust principles. A trustee's primary duty is to carry out the settlor's intent as determined from the terms of the trust instrument. Austin v. U.S. Bank,73 Wn. App. 293, 304, 869 P.2d 404, review denied, 124 Wn.2d 1015
(1994); Restatement (Second) of Trusts § 164(a). As to the forest board transfer lands trust, governing statutes comprise the trust instrument.
Similar principles would emerge from Washington case law concerning the relationship between statutory provisions and the common law generally. Where a statutory standard conflicts with the common law, the common law gives way. Washington Water Power Co. v. Graybar Electric Co., 112 Wn.2d 847, 851-56, 774 P.2d 1199, modified 779 P.2d 697 (1989). By the same token, however, insofar as it is not inconsistent with state statutes, the common law is the rule of decision in this state. RCW 4.04.010. Moreover, where a statute uses a term with a settled meaning at common law, such as the term trust, its common law meaning is presumed absent a different statutory definition. Hearst Corp. v. Hoppe, 90 Wn.2d 123,135, 580 P.2d 246 (1978). And, of course, Skamania recognizes that common law trust principles play a role in administering the forest board transfer lands by virtue of the language in RCW 76.12.030 creating a trust. Skamania, 102 Wn.2d at 133.
Under these authorities, the extent to which common law principles apply in the administration of the forest board transfer lands trust is in large measure, a function of the statutory terms of the trust. Based on these principles, RCW 76.12.030, the statute creating the forest board transfer lands trust, is the starting point in identifying the terms of the trust and the responsibilities of the Department in managing and administering these lands.
RCW 76.12.030 provides that "[s]uch land shall be held in trust and administered and protected by the department as other state forest lands". (Emphasis added.) RCW 76.12.030 also plainly directs the distribution of income generated by the lands. After deduction of a percentage established by the board, not to exceed twenty-five percent, the balance is to be paid to the county in which the land generating the revenues is located.
RCW 76.12.120 addresses in part, how the Department is to administer state forest lands. As such, it is a term of the forest board transfer lands trust. This statute reserves such lands from sale. It authorizes the lease and the sale of timber and other products from these lands, if the Department finds such leases or resource sales to be in the best interests of the state. The statute provides:
 All land, acquired or designated by the department as state forest land, shall be forever reserved from sale, but the timber and other products thereon may be sold or the land may be leased in the same manner and for the same purposes as is authorized for state granted land if the department finds such sale or lease to be in the best interests of the state and approves the terms and conditions thereof.
Additional statutes also direct how the Department is to administer and protect state forest lands and thus, are terms of the forest board transfer lands trust under the above-quoted language of RCW 76.12.030. For example, RCW 76.12.140 provides that the lands are to be logged and cared for in a manner that will ensure natural reforestation. RCW 76.12.050 authorizes land exchanges under certain circumstances, and RCW 76.12.072 authorizes certain reconveyances of lands for public parks. Another example is RCW 79.68.040, which requires the Department to manage state owned lands primarily valuable for growing forest crops on a sustained yield basis insofar as it is compatible with other statutory directives.
The purpose of this discussion is not to set forth all of the terms of the forest board transfer lands trust. Rather, it is to point out that by virtue of RCW 76.12.030, the terms of the forest board transfer lands trust are found in statutes directing the administration and protection of state forest lands. These statutes define the trust relationship and the Department's obligations and authority in administering the trust. For the reasons explained above, to the extent common law trust principles are inconsistent with these statutory terms, the common law trust principles give way.
An example of this consequence in the context of the forest board transfer lands trust arises with respect to diversification of trust assets. The nature of a trustee's obligations with respect to diversification is discussed at length in response to Question 2 relating to the federal grant lands. With respect to the forest board transfer lands trust, however, this duty is displaced by the directive in RCW 76.12.120 that these lands "shall be forever reserved from sale".
Additionally, where common law duties remain, the nature and scope of those duties are in part, shaped by the purpose and terms of the trust. The duties determined to arise simply by virtue of the trust relationship include the duty of undivided loyalty and the duty of prudent management recognized in Skamania, as well as other common law fiduciary duties set forth on page 13 of this opinion. These relational powers and duties may be altered, limited, or extinguished by the terms of the trust. Restatement (Second) of Trusts § 164 cmt. h, i; see also Baldus v. Bank of California, 12 Wn. App. 621, 627, 530 P.2d 1350, review denied,85 Wn.2d 1011 (1975).
In discussing the duty of undivided loyalty, the Restatement (Third) of Trusts section 170, comment q, explains:
 In administering the trust the trustee is under a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust.
(Emphasis added.) Similarly, in discussing the duty of impartiality in the context of successive beneficiaries, the Restatement (Third) of Trusts section 232, comment c, states:
 The precise meaning of the trustee's duty of impartiality and the balancing of competing interests and objectives inevitably are matters of judgment and interpretation. Thus, the duty and balancing are affected by the purposes, terms, distribution requirements, and other circumstances of the trust, not only at the outset but as they may change from time to time.
(Emphasis added.)
As previously discussed, in addition to generating income for taxing districts, including counties, reforestation and maintenance of state forest lands are purposes of the forest board transfer lands trust. These purposes would be relevant in considering whether the Department has complied with a duty of loyalty. Similarly, as previously noted, the forest board transfer lands are to be forever withheld from sale and are to be harvested on a sustained yield basis. The common law duty of prudent management likewise would be considered with these trust provisions in mind.
This opinion next responds to a subsidiary question the Legislature has asked:
 May the lands be managed as an undifferentiated whole, or must they be managed based on the economic interests of each county separately?
 SHORT ANSWER
Statutes governing the forest board transfer lands create a single trust. They authorize management of the lands as an undifferentiated whole.
 ANALYSIS
In AGO 1987 No. 10, this office considered several questions relating to the forest board transfer lands, including whether these lands are held in a single trust or separate trusts for each of the counties. Based on several factors, AGO 1987 No. 10 concluded that the forest board transfer lands are held in a single trust. These factors included the absence of any language in RCW 76.12.030, the statute creating this trust, indicating that a separate trust was created on behalf of each county in which such lands were located. The 1987 opinion contrasted the absence of such language in RCW 76.12.030 with language in RCW 79.64.030
identifying separate federal grant land trusts. AGO 1987 No. 10, at 3-4. The 1987 opinion also based its conclusion on the circumstances under which and the purposes for which these lands were acquired by the counties. In this respect, the opinion noted that the counties did not acquire these lands in a proprietary capacity. Instead, the counties acquired them through tax foreclosure proceedings, as part of the tax collection process, and held them for the benefit of the numerous taxing jurisdictions entitled to distributions of property taxes from them. AGO 1987 No. 10, at 4-5. The 1987 opinion also noted that the boundaries of the taxing districts benefited by distribution of revenues under RCW 76.12.030 are not necessarily coextensive with the boundaries of the county, further underscoring the insignificance of the county geographical unit in this trust. AGO 1987 No. 10, at 6 n. 7.
This conclusion of AGO 1987 No. 10 also is consistent with the historical construction given RCW 76.12.030 by the Department of Natural Resources. "Since its inception, the department has managed and accounted for the State Forest Board Transfer lands as a single trust." Department of Natural Resources, State Forest Board Lands: A Report to the Counties, 11 (1987). A longstanding construction of a statute by the agency charged with administering it is entitled to weight in discerning legislative intent, particularly where the Legislature subsequently has amended the statute and has not disturbed the administrative construction. Green River Comm'ty College v. Higher Ed. Personnel Bd., 95 Wn.2d 108,118, 622 P.2d 826 (1980), modified, 95 Wn.2d 962,633 P.2d 1324 (1981). As previously noted on page 63 of this opinion, the Legislature has amended RCW 76.12.030 on several occasions in recent years. It has not amended the statute in any way disturbing the historic construction of the Department or the conclusion reached in AGO 1987 No. 10.
Finally, we again note the language in RCW 76.12.030 providing that the forest board transfer lands are to be administered and protected "as other state forest lands" and that RCW 76.12.120 authorizes the lease of these lands and the sale of resources from them if the Department determines that the sale or lease is in the "best interests of the state". This hardly is language indicating that the forest board transfer lands are to be administered based on the economic circumstances and interests of each county in which such lands are located.
 QUESTION 3 If Statutes Leave Discretion In The Department Of Natural Resources In Administering These Lands, Against What Legal Standard Is Its Exercise Of Discretion To Be Measured? SHORT ANSWER
The Department's exercise of discretion in administering the forest board transfer lands would be measured against an abuse of discretion standard.
 ANALYSIS
Our analysis in response to Question 5 concerning the Department's exercise of discretion in managing the federal grant lands applies equally to the forest board transfer lands and constitutes our response to this question as well.
Insofar as the forest board transfer lands are concerned, this analysis simply notes that numerous statutes, including the two briefly noted below provide policy-making and administrative discretion to the Department of Natural Resources with respect to the forest board transfer lands. First, RCW 43.30.150(2) provides that the Board of Natural Resources shall:
 Establish policies to ensure that the acquisition, management and disposition of all lands and resources within the department's jurisdiction are based on sound principles designed to achieve the maximum effective development and use of such lands and resources consistent with laws applicable thereto[.]
Similarly, RCW 76.12.120 authorizes the Department to sell timber and other products from these lands and lease the lands if the Department finds that doing so is in the best interests of the state and approves the terms and conditions of the sale or lease.
Although each of these statutes provide general standards to guide the Department's exercise of discretion, they nevertheless leave considerable discretion in the Department. Its exercise would be tested by an abuse of discretion standard.
We trust this opinion will be of assistance to you.
Sincerely,
CHRISTINE O. GREGOIRE
JAMES A. ANDERSEN Special Assistant Attorney General
ROBERT J. DORAN Special Assistant Attorney General
MAUREEN HART Senior Assistant Attorney General
Enc.: Senate Concurrent Resolution 8435